**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank HAYES, Dorothy Foley Hayes and Alice Baldwin, Defendants-Appellants.**

No. 78–5149.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1979.

Rehearing and Rehearing En Banc
Denied March 19, 1979.

Charles M. McDonald, Waco, Tex., Marvin Miller, San Antonio, Tex., for defendants-appellants.

Jamie C. Boyd, U. S. Atty., San Antonio, Tex., Daniel Rinzel, Drew S. Days, III, Asst. Atty. Gen., Criminal Section, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before INGRAHAM, GEE and FAY, Circuit Judges.

FAY, Circuit Judge:

This case involves an outrageous episode in law enforcement. Taking the evidence in a light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), this story unfolds as follows.

On September 14, 1975, at 10:30 p. m. Officer Donald McCall, of the Castroville, Texas Police Department was directed by appellant Frank Hayes, then Chief of Police of the Castroville Police Department, to serve misdemeanor arrest warrants on Richard A. Morales. McCall was also directed by Hayes to obtain the serial numbers from a stereo and television set at the Morales residence in order to determine whether these items had been stolen. Although Hayes suspected that these items had been stolen, they had been rented by Morales and his wife from a rental agency.

The misdemeanor arrest warrants had been obtained by Hayes several days earlier from Medina County Deputy Sheriff Alvin Santleben who had arrested Morales on the warrants a month earlier, but released him without processing. Morales had, in fact, satisfied the warrants by voluntarily appearing at a court hearing on September 12, 1975 in Medina County on charges of failure to deliver several cows he had sold.

Officer McCall proceeded to the Morales residence in his patrol car accompanied by a friend, Steven Worthy, who had been riding with him that day. McCall placed Morales under arrest, handcuffed him and searched him. He then obtained serial numbers from the television and stereo. At this time appellant Frank Hayes arrived at the Morales residence in his personal car accompanied by Dennis Dunford, his prospective son-in-law. Frank Hayes called Morales a "thieving son of a bitch," told him he was going to kill him numerous times and struck him in the stomach with his fist. All five persons then left the Morales residence; Officer McCall, Steven Worthy and Richard Morales in the patrol car, with Frank Hayes and Dennis Dunford in Hayes' personal car. The two cars proceeded several miles out of Castroville to a gravel road in a deserted area. Several stops were made along the way at which time Hayes instructed McCall to tell Morales that Hayes was going to kill Morales if Morales did not reveal the location of stolen merchandise. Hayes also told Dennis Dunford not to worry about any shots because they were just trying to scare Morales.

When the two cars reached the deserted gravel road, Hayes directed that all lights be extinguished, took possession of a double barreled 12 gauge shotgun and struck Morales in the stomach with the breach of the shotgun. Hayes then stated that he had killed one Mexican and was "fixing to kill" another one. Hayes directed McCall to remove the handcuffs from Morales, and told McCall and Worthy to leave the scene.

After McCall and Worthy left, Hayes questioned Morales further and pushed him with the butt and then the barrel of the

shotgun. Morales pushed the barrel of the gun aside and stepped back. The shotgun discharged, killing Morales.

Defendant Frank Hayes then got back in his car and drove up the road several hundred yards to where McCall and Worthy had stopped in the patrol car. Hayes told McCall to inform the Sheriff's office that Morales had escaped. After McCall and Worthy left for the Sheriff's office, Hayes and Dunford returned to the scene of the shooting and loaded Morales' body into the rear seat floor boards of Hayes' car. Hayes asked Dunford if he knew of a place to bury the body, but Dunford said he did not. Hayes told Dunford that the shooting had been an accident, but no one would believe him.

Hayes then drove to his residence in Castroville where he dropped off Dennis Dunford and picked up his wife, Dorothy Foley Hayes. Mr. and Mrs. Hayes then departed in the car with the body in the rear seat and returned to the Hayes' residence approximately one hour later. Frank Hayes requested Dunford to accompany him and they drove to a location out of Castroville where they transferred the body from the rear seat to the trunk of the car and returned to the Hayes' residence.

Mrs. Hayes then left the Hayes' residence with her daughter Jeannie and drove the car with Morales' body in the trunk to San Antonio where she picked up her sister, defendant Alice Baldwin. They then proceeded to transport Morales' body to Panola County, Texas near the Louisiana border—a distance of approximately 400 miles—stopping en route to purchase shovels. Upon reaching Panola County, they proceeded to the property of Mrs. Hayes' brother and buried the body in a shallow grave in an isolated area. They then drove to Alice Baldwin's cottage in Llano County, Texas where Mrs. Baldwin and Mrs. Hayes were apprehended while in the process of disposing of bloody garbage bags and shovels from the trunk of the car.

After initially denying any knowledge of these events Mrs. Hayes eventually admitted to burying the body and directed law enforcement officials to its location. Similarly, appellant Alice Baldwin initially denied having been in Panola County, but subsequently confessed to taking part in the burial of the body of Richard Morales.

All three appellants testified. Defendant Frank Hayes, although displaying a detailed recollection of the events leading up to the shooting, claimed to be unable to remember the events which occurred after the shooting. He testified that the shooting was accidental. Appellant Dorothy Foley Hayes testified that she did not know Frank Hayes had committed any crime and buried the body to preserve it as evidence. Appellant Alice Baldwin denied taking part in the burial, but admitted to helping dispose of the burial implements.

In January, 1976, Frank Hayes was indicted for the offense of capital murder in Medina County, Texas. On change of venue, that case was transferred to Tom Green County, Texas, and was tried at the County Seat at San Angelo in the 51st Judicial District Court for the offense of murder. The jury found Frank Hayes guilty of the lesser included offense of aggravated assault and assessed his punishment at ten years confinement in the Texas Department of Corrections. Mrs. Hayes entered a plea of *nolo contendere* to the charge of concealing physical evidence, a misdemeanor in the County Court of Medina County. She was sentenced to one year probation. Appellant Baldwin was not prosecuted in state court.

On February 23, 1977 a Federal Grand Jury returned a two-count indictment. Count I charged defendant Frank Hayes with violating 18 U.S.C. § 242 by depriving Richard A. Morales of the right to liberty without due process of law, resulting in the death of Richard A. Morales. Count II charged defendants Dorothy Foley Hayes and Alice Baldwin with being accessories after the fact in violation of 18 U.S.C. § 3.

After the filing of a motion on behalf of defendant Frank Hayes for a determination of mental competency and sanity, the district court ordered a psychiatric examination. A competency hearing was held at which time the report of the examining

psychiatrist was received and testimony taken. At the conclusion of the hearing defendant Frank Hayes was found competent to stand trial.

The indictment was returned in the San Antonio Division of the Western District of Texas. Defendants' motion for a change of venue to the Division of their choice was granted and trial was held before a jury in the Waco Division on September 26 to 29, 1977. On September 29, 1977 the jury returned verdicts of guilty against all defendants.

Prior to sentencing, the district court committed defendant Frank Hayes to the custody of the Attorney General pursuant to 18 U.S.C. § 4205(c) for three months of study and observation. After the results of this study were made available to the Court, defendant Frank Hayes was sentenced to life imprisonment. Defendant Dorothy Foley Hayes was sentenced to three years imprisonment pursuant to 18 U.S.C. § 4205(b)(2), making her eligible for parole at any time. Defendant Alice Baldwin was sentenced to eighteen months imprisonment with twelve months suspended and five years supervised probation. Appellants urge several grounds for reversal of their convictions. For reasons more fully developed below, we affirm.

## I. DOUBLE JEOPARDY, PETITE POLICY, COLLATERAL ESTOPPEL, DISCRIMINATORY PROSECUTION

Appellant's first group of arguments concern the validity of the federal prosecution in light of the previous state prosecution. First, appellant urges this court to abandon the well-established rule that there is no constitutional bar to successive state and federal prosecutions for the same criminal conduct. The leading cases in this area are *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) and *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In *Abbate*, the defendant had first been tried and convicted in an Illinois court for conspiring to damage another's property and had been sentenced to three months imprisonment. He was subsequently prosecuted by the federal government for conspiring to destroy communications facilities operated or controlled by the United States, 18 U.S.C. § 1362 (1964). *Bartkus* involved a defendant who was convicted of armed robbery under Illinois law, after having been acquitted by a federal jury of robbing a federally insured savings and loan association, 18 U.S.C. § 2113 (1964). The Court reasoned that to outlaw successive prosecution would enable one sovereign to interfere with the administration of the other's criminal law. The classic formulation of this "dual sovereignty" concept states:

> We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory. . . .
> Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other. It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.

*United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922).

While the Court has consistently expressed concern over the possible abuses of dual prosecutions, *see Bartkus v. Illinois*, 359 U.S. 121, 138, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) ("the greatest self-restraint is necessary when that federal system yields results with which a court is in little sympathy"); *United States v. Lanza*, 260 U.S. 377, 383, 43 S.Ct. 141, 67 L.Ed. 314 (1922) ("in the benignant spirit" in which the federal system is administered, defendants should be subject to dual state-federal prosecutions only "in instances of peculiar enormity"), *quoting Fox v. Ohio*, 46 U.S. (5 How.) 410, 434, 12 L.Ed. 213 (1847), and while the *Lanza-Abbate-Bartkus* doctrine has met harsh criticism, *see, e. g.*, Harrison, *Federalism and Double Jeopardy; A Study in the Frustration of Human Rights*, 17 U. Miami L.Rev. 306 (1963); Fisher, *Two Sovereignties and the Intruding Constitution*, 28 U.Chi.L.Rev. 591, 599 (1961); Grant, *The*

*Lanza Rule of Successive Prosecutions*, 32 Colum.L.Rev. 1309, 1329 (1932), the doctrine has nonetheless been applied consistently by the Circuit Courts. *See, e. g., United States v. Harris*, 551 F.2d 621 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 125, 54 L.Ed.2d 98 (1977); *United States v. Cordova*, 537 F.2d 1073, 1075 (9th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 385, 50 L.Ed.2d 327 (1976); *United States v. Villano*, 529 F.2d 1046, 1061 (10th Cir.), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976); *United States v. Johnson*, 516 F.2d 209, 212 (8th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975); *United States v. Barone*, 467 F.2d 247, 250 (2d Cir. 1972). Moreover, the Supreme Court has recently reaffirmed the dual sovereignty doctrine. *See United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (Indian tribe and federal government are dual sovereigns); *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) (dictum) (dual sovereignty principle is inherent in the federal system). Unless and until the Supreme Court overturns *Abbate*, appellant's double jeopardy claim must fail.

■ Appellant's next contention is that the Justice Department violated its own published policy against dual prosecutions (the Petite Policy) and has thus denied appellants the constitutional protections of Due Process and Equal Protection. The Petite Policy is an internal Department of Justice policy regulating the initiation of federal prosecutions in two instances,[1] only one of which is here relevant. Briefly, the policy provides that defendants who are prosecuted by a state will not be subject to federal prosecution for federal crimes arising from the same act except when there is a compelling federal interest and approval of an Assistant Attorney General has been obtained.[2] Thus, the Policy is an executive response to the restraint urged by the Supreme Court in *Bartkus* and *Abbate*. The question here presented is whether a defendant can use the Petite Policy as a sword to invalidate an otherwise legitimate indictment. The question is further complicated by the fact that this policy was modified by Attorney General Bell after an initial determination had been made not to prosecute defendants herein. The new formulation requires that determinations of prosecution for alleged violations of civil rights must be made on an individual basis. Under the new formulation of the rule, the defendants were subject to prosecution. Defendants argue that the retroactive application of the modified policy constitutes a denial of due process. Absent a showing of discriminatory prosecution, however, law enforcement policy determinations to prosecute or not prosecute a certain class of violations of federal law raise no constitutional problem. Those individuals caught in the net of increased awareness and sensitivity to particular classes of crimes cannot justify their conduct by noting that at the time of their illegal activity, the community was more tolerant of similar transgressions.

■ In addition, while we recognize that agencies of the federal government are bound by the rules and regulations which they officially promulgate, *see Accardi v. Schaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), we are not prepared to hold that a letter, press release, or similar statement by the Attorney General, which is not promulgated as a regulation of the Justice Department and published in the Federal Register, can serve to invalidate an otherwise valid indictment returned by the Grand Jury. *Sullivan v. United States*, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L.Ed. 210 (1954); *United States v. Hutul*, 416 F.2d 607, 626–27 (7th Cir. 1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

1. *See generally*, Note, *The Petite Policy: An Example of Enlightened Prosecutorial Discretion*, 66 Geo.L.J. 1137 (1978).

2. The Petite Policy also regulates multiple federal prosecutions by prohibiting separate prosecutions for different federal offenses committed during the course of a single transaction unless prior approval of an Assistant Attorney General is obtained. U.S. Dept. of Justice, United States Attorneys' Manual §§ 9–2.142 to 143 (Jan. 10, 1977) (Title 9—Criminal Division).

The question thus becomes whether Frank Hayes was a victim of selective prosecution. Appellants urge that the trial court erred in summarily overruling appellant's motion to dismiss the indictment based on selective prosecution. Mindful of the separation-of-powers implications permeating this entire area,[3] we note that in order to make out a claim of selective prosecution, the defendant must show: 1) that others similarly situated have not been prosecuted, and 2) that the Government's prosecution of him is selective, invidious, in bad faith or based on impermissible considerations such as race, religion, or his exercise of constitutional rights. *United States v. Kahl*, 583 F.2d 1351, 1353 (5th Cir. 1978).

In order to obtain an evidentiary hearing on the defense of selective prosecution, facts sufficient to create a reasonable doubt about the constitutionality of a prosecution must be presented. *United States v. Ream*, 491 F.2d 1243, 1246 (5th Cir. 1974). In this case, the trial court denied appellants' motion for an evidentiary hearing to consider selective prosecution in that "no reasonable probability of actual discrimination has been demonstrated." We agree.

With respect to the first prong of the selective prosecution test, appellants again raise the Petite Policy and argue that Hayes has been singled out for prosecution contrary to the Petite Policy. Although defendants assert that "hundreds" of other similar cases were not federally prosecuted after a state prosecution had been pursued in good faith, only three such cases were presented to the trial court. The government, on the other hand, presented the trial court with forty-three examples of dual state and federal · prosecution in recent years, twenty-eight of which were for civil rights violations. Indeed, the existence of civil rights cases where the federal government has not sought to prosecute after a previous state prosecution only serves to highlight the stated intent of the Department of Justice to prosecute only when the Department determines that prosecution is necessary to vindicate and protect certain constitutional liberties. As appellants have raised no reasonable doubt that the prosecutor's motives were improper, we conclude that the trial court was correct in denying appellants' motion to dismiss the indictment on grounds of selective prosecution.[4]

Appellants further claim that the federal prosecution should be collaterally estopped due to the previous state litigation. But appellants' reliance on collateral estoppel is misplaced. Collateral estoppel does not apply to successive prosecutions by the state and federal governments because the party that the defendant seeks to estop in the second prosecution was not a party to the first trial. *Turley v. Wyrick*, 554 F.2d 840, 842 (8th Cir. 1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978); *United States v. Smith*, 446 F.2d 200, 202 (4th Cir. 1971); *United States v. Hutul*, 416 F.2d 607, 626 (7th Cir. 1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

3. As we noted in *United States v. Ream*, 491 F.2d 1243, 1246 n. 2 (5th Cir. 1974), prosecutorial discretion "flows not from a desire to give carte blanche to law enforcement officials but from recognition of the constitutional principle of separation of powers."

The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

*Id.*, quoting *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).

4. In light of our finding that Hayes has failed to meet the burden concerning the first prong of the selective prosecution test, we need not decide whether the trial court erred in its determination that the prosecution was not racially motivated. We do note that the record discloses that Hayes is Caucasian and Morales was Mexican-American.

## II. § 242 INTENT

Defendant Hayes was tried and convicted of violating 18 U.S.C. § 242. That Section provides:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; *and if death results shall be subject to imprisonment for any term of years or for life.*

That portion of the statute set out in italics was added in 1968. Act of Apr. 11, 1968, Pub.L. 90–284, 82 Stat. 75. Appellant asserts that the amendment to Section 242 necessarily contemplates a willful intent to do the act which causes the resulting death, and a willful intent to cause the death of the victim. Thus, appellant asserts that the indictment is insufficient in that it fails to charge Hayes with intentionally causing the death of Morales.[5] In addition, Hayes argues that the jury should have been instructed with respect to this willfulness requirement. Hayes' argument, unlike his shotgun, hits wide of its mark.

▮▮▮ In *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court considered the "intent" requirement of the then unamended version of 18 U.S.C. § 242. In *Screws,* the Court held that § 242 was not unconstitutionally vague if it was read as requiring "an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." 325 U.S. at 104, 65 S.Ct. at 1037. The Supreme Court noted that it was not sufficient to instruct the jury that the requirements of the statute were met if petitioners had a "generally bad purpose." 325 U.S. at 107, 65 S.Ct. 1031. Thus, *Screws* makes it perfectly clear that once a due process right has been defined and made specific by court decisions, the right is encompassed by § 242. Further, in order to violate § 242, one must have a specific intent to willfully violate that defined right. Defendant concedes, as he must, that there are numerous cases which support the proposition that one's right to be tried by a court, and not by ordeal, and thus to be free from unlawful assault by state law enforcement officers when lawfully in their custody, has been made a definite and specific part of the body of due process rights protected by the fourteenth amendment of the Constitution, and therefore within the purview of § 242. *See, e. g., Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1954); *United States v. Stokes,* 506 F.2d 771 (5th Cir. 1975); *United States v. Walker,* 216 F.2d 683 (5th Cir. 1954), *cert. denied,* 348 U.S. 959, 75 S.Ct. 450, 99 L.Ed. 748 (1955); *Lynch v. United States,* 189 F.2d 476 (5th Cir.), *cert. denied,* 342 U.S. 831, 72 S.Ct. 50, 96 L.Ed. 629 (1951). The question, therefore, is whether the 1968 Amendment has altered the equation by adding a life imprisonment provision in § 242 cases where "death results." We hold that the 1968 Amendment alters the statute only insofar as requiring the additional element that death ensued as a proximate result of the accuseds' willful violation of a victim's defined rights.

---

5. The indictment charged as follows:

On or about the 14th day of September, 1975, in Castroville, Texas, in the Western District of Texas, Defendant, Frank Hayes then an officer of the Castroville Police Department, acting under color of the laws of the State of Texas, did wilfully strike and assault Richard A. Morales, an inhabitant of the State of Texas, and did thereby wilfully deprive Richard A. Morales of the right secured and protected by the Constitution and laws of the United States not to be deprived of liberty without due process of law, resulting in the death of Richard A. Morales, in violation of Section 242, Title 18, United States Code.

A fundamental principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct. Thus, where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken and the perpetrator is held criminally responsible for the resulting harm. When the Congress provided that any deprivation of defined rights under color of law resulting in death may be punished by life imprisonment, we must consider it to have been fully cognizant of the principles of legal causation. We adhere to the accepted practice among federal courts in construing a federal criminal statute where specific terms are left undefined. We give those terms their common law meaning. *See United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). No matter how you slice it, "if death results" does not mean "if death was intended." To hold otherwise would make a mockery of the statute. Can it be seriously argued that a police officer, determined only to extract a confession from a prisoner, who inflicts a fatal wound in the persuasion process, has not committed the type of offense which Section 242 was designed to proscribe? Conversely, can it be seriously argued that a police officer who illegally arrests a person who, on the way to the paddywagon, is killed by a bolt of lightning has committed the type of offense which the amendment to Section 242 was designed to deter? We think not. Rather, the more severe punishment prescribed for those Section 242 violations resulting in death is clearly designed to deter the type of conduct that creates an unacceptable risk of loss of life. The risk of death resulting from being struck in the stomach with the breach, butt and then the barrel of a loaded double barreled 12-gauge shotgun is precisely such an unacceptable risk. Loaded guns are designed to injure and kill.

The theory of proximate causation can also answer appellant's quasi-vagueness argument. Our understanding of vagueness is that statutes which are "vague" are constitutionally infirm because they fail to give notice of what specific conduct is proscribed. Thus, a prosecution under a vague statute constitutes a denial of due process. *Rowan v. United States Post Office Department,* 397 U.S. 728, 740, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). In rejecting a vagueness attack on Section 242 however, the Supreme Court has ruled that "a requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves the Act from any charge of unconstitutionality on the grounds of vagueness." *Screws v. United States,* 325 U.S. 91, 103, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945). The Court went on to say:

> [B]ut willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite. When they are convicted for so acting, they are not punished for violating an unknowable something.

*Id.* at 105, 65 S.Ct. at 1037. The amendment to Section 242 does not alter this as the amendment did not proscribe any additional *conduct* which was not already punishable under the unamended version of Section 242. Rather, those cases of infringement with defined rights which result in death are a subset of the universe defined as those cases of infringement with defined rights. Activities which fall within the former naturally fall within the latter.

Nonetheless, appellant claims that the statute is vague because "the law does not provide any means to follow the causal connections between the death and the acts of violating civil rights." Appellant's brief at 24. But the logical corollary of the proposition that foreseeable events are considered within the chain of legal causation, is that those consequences deemed unforeseeable are outside the sphere of culpability. To cramp the meaning of "result" to in-

clude only "direct causation," or to expand its reach so as to make the statute sound in strict liability, would not only be contrary to the common law principles of legal causation, but would also undermine the purpose of the statutory provision—that is, to protect persons in the free and uninhibited exercise of their constitutional liberties. This we cannot do. Accordingly, appellant's vagueness and "willful death" arguments must fail.[6]

## III. COMPETENCY

The third group of appellant's assertions of error concern the competency of Frank Hayes. Counsel for appellant Hayes urges that: 1) Hayes was incompetent to stand trial because of his use of drugs administered by agents of the government, 2) Hayes was denied due process because, due to his dependence on drugs, he was unable to assist counsel in his defense, 3) the trial court erred in not ordering, on its own motion, a competency hearing during the trial, 4) Hayes was denied a fair trial because the trial court prohibited testimony concerning his dependence on drugs and therefore the jury could not properly evaluate his credibility and demeanor, 5) the trial court erred in not instructing the jury that, because of drug dependence, the jury was not observing Hayes in his "natural state and demeanor free of defect," and 6) the trial court erred in not submitting the issue of Hayes' insanity to the jury.

In March 1973, appellant Hayes was severely injured while attempting to apprehend criminals in a liquor store robbery. He was shot several times and was beaten in the head. As a result of this incident, Hayes underwent six or seven surgical procedures resulting in a colostomy and repairs of various puncture wounds. Between March 1973 and the shooting here in question, Hayes was almost continuously on medication, including various narcotics and analgesics. On the evening of the Morales shooting, appellant Hayes had taken the tranquilizer Valium.

At arraignment on March 3, 1977, the court noted that it had been informed that Hayes was suffering from "organic brain syndrome" and accordingly, ordered a competency examination of appellant Hayes. The examination was ordered for March 11, 1977. The doctor issued his report on April 28, 1977. The competency hearing was held on May 26, 1977. At the hearing, the court-appointed psychiatrist testified that in his opinion Hayes was competent to stand trial. He based his opinion on his examination of the defendant prior to the hearing and also on his consultation with Hayes on the morning of the hearing.

 The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); 18 U.S.C. § 4244. A district court's determination of competency to stand trial may not be set aside on review unless it is clearly arbitrary or unwarranted. *United States v. Fratus,* 530 F.2d 644, 647 (5th Cir. 1976). *Cf. United States v. Schaffer,* 433 F.2d 928, 930 (5th Cir. 1970) ("clearly erroneous" standard of review); *United States v. Gray,* 421 F.2d 316, 317–18 (5th Cir. 1970) (same). During the competency hearing, the following colloquy between the court-appointed psychiatrist and the court took place:

THE COURT: What was your conclusion, then, about his ability at this time, at the present time to understand, have a rational understanding of the proceedings in Court, to follow those proceedings and to assist his attorneys in his defense? A. Sir, my opinion is he is competent at the present time. He is able to understand the proceedings occurring in the Courtroom. In my opinion he is able to cooperate well with his attorneys . . . .

6. In light of our resolution of this issue, appellant Frank Hayes' argument that the evidence

was insufficient to prove an intent to kill Morales must also fail.

Moreover, when discussing the effect of the drugs on appellant, the doctor stated:

As a less depressed person on a tranquilizer, he cooperates and he is able to keep a train of thought and he can maintain contact with the current situation; he can answer questions and remember the past well. In other words, he becomes an organized, close to normal person on the drug.

In light of this testimony, we are unable to find the trial court's finding of competency clearly erroneous or arbitrary.

■■■ Nonetheless, it is argued that without large doses of Aventyl (an anti-depressant) and Mellaril (an "anti-psychotic" drug), defendant would be incompetent. Appellant Hayes argues that a finding of "incompetence but for drug maintenance" precludes a finding of competence to stand trial. But this argument is akin to declaring comatose all those diabetics who, but for periodic insulin injections, would lapse into coma. As noted by the court-appointed psychiatrist, "there are many people who are maintained on moderate to sometimes very large amounts of tranquilizers in order that they may have jobs and function in society." The court's inquiry is limited to determining whether defendant is able to assist in his defense and comprehend the nature of the proceedings against him. Once it is determined that he is competent to stand trial, the method of achieving that competence is of minor import. This is not to imply that drug maintenance is irrelevant in determining competency. Rather, all factors relating to perception and facility are to be considered. However, once it is determined that the accused has the requisite mental capacity, his method of maintaining that capacity is significant only in the area of continued competency throughout the proceedings.

Hayes urges that the trial court erred by failing to conduct, sua sponte, a competency hearing during the trial. The standard applied by this court in determining whether a competency hearing was warranted during the trial is

whether the evidence presented to the trial judge is sufficient to raise a 'bona-fide doubt' as to the defendant's competence to stand trial. In other words, there must be some indication to the trial judge that competency to stand trial is a *substantial* issue before a referral of the defendant to a psychiatric examination is required. The minimum showing required for an examination must turn on the issue raised and the facts presented.

*Tyler v. Beto,* 391 F.2d 993, 997 (5th Cir. 1968), *cert. denied,* 393 U.S. 1030, 89 S.Ct. 642, 21 L.Ed.2d 574 (1969) (emphasis in original) (citations omitted). *See Fitch v. Estelle,* 587 F.2d 773, 777–78, (5th Cir. 1979).

■■■ Here, defendant was found competent at a competency hearing. After that finding, the trial judge made this request:

I would like to ask counsel for the defense to do this: if at any time during the progress of the proceedings . . . you feel there is any question about Mr. Hayes' ability to communicate with you . . . to consult with you with a reasonable degree of rational understanding of the proceedings against him—if at any time Mr. Hayes is in this Court and you feel there is a question about his ability to understand, if you will call that to my attention, then we would see what the situation is and make a determination at that time.

Appellant Hayes' counsel remained silent on this matter throughout trial. The only facts that came to the trial court's attention after the original competency determination were that Hayes' medication had been increased and that Hayes felt "kind of fuzzy, just kind of wobbly." These facts are not sufficient to suggest a substantial doubt as to Hayes' capacity. Accordingly, another determination of competency was not required.

■■■ Hayes further argues that the trial court erred by excluding evidence that without the use of drugs, Hayes would have been incompetent. This, Hayes urges, denied the jury the opportunity to properly consider Hayes' credibility and demeanor. But as we have noted, Hayes' capacity when not taking his medication is not at

issue here. Rather, the jury is required to assess and judge the credibility and demeanor of the "medicated Hayes." This requires an assessment of the effects of the drugs which Hayes was taking, and the trial court quite properly admitted testimony as to the effect of the medication on the defendant's memory and demeanor.

■ At the close of trial, Hayes requested a specific jury instruction relating to his maintenance on drugs and the effect of those drugs on his demeanor. The instruction was denied and objection was timely made. We find no error in the trial court's refusal to charge the jury to consider the effect of drugs on Hayes' demeanor and memory, because the substance of the requested instruction was adequately covered in the court's general credibility charge. *United States v. Green,* 327 F.2d 715, 718–19 (7th Cir.), *cert. denied,* 377 U.S. 944, 84 S.Ct. 1350, 12 L.Ed.2d 306 (1964).

Appellant Hayes' final "competency" claim concerns the failure of the trial court to submit the issue of insanity to the jury. In this appeal, appellant submits that the issue of insanity should have been offered to the jury in view of his physical and mental condition aggravated by the use of drugs and alcohol at the time of the alleged offense, and further, that it was plain error for the court to fail to so charge the jury. Fed.R.Crim.P. 52(b).

■ Although appellant Hayes noticed an intention to raise the defense of insanity, and although the trial court and government counsel tried most of the case with the understanding that insanity was to be a defense used by Hayes, appellant's trial counsel explicitly withdrew this defense when it came time for the government to present evidence of Hayes' sanity. We note the following colloquy between Judge Spears, Marvin Miller (counsel for defendants) and Karen Moore (counsel for the United States):

THE COURT: Mr. Miller, I hope this question is not suggestive of anything other than the concern on my part as to whether or not you want to do it: do you still want the Court to charge on the issue of insanity?

MARVIN MILLER: No, your Honor. In regard to that proposition, I believe the government's next witness is Dr. Coons, a psychiatrist from Austin. There is no evidence in the case concerning the sanity from the medical testimony that Frank Hayes was insane at the time. I think anything that this doctor might testify to would be irrelevant and immaterial and certainly not rebuttal.

MISS MOORE: Your Honor, I am shocked to hear defense counsel say that, after defense counsel has used the fact that they were going to raise an insanity defense to get evidence into this case under that guise which would have been wrongfully objectionable otherwise, and, your Honor, as your Honor recalls the frequent conferences we have had over the past three days, they called Dr. Sparks and numerous other people and got all of this in and now at the last moment they tell us that they don't think they have raised the issue of the man's insanity. They have most certainly raised that issue, your Honor. We intend to present evidence on that issue.

THE COURT: Well, I am not going to rule whether you present evidence on it. I am just asking him whether he wants—this is a defensive issue and if he doesn't want it submitted, frankly, I don't see that it is in the case at all, and this doesn't mean that I am not going to let you put your doctor on and let him testify in rebuttal to any of the things that you feel are appropriate, but as far as the defense of insanity is concerned—and I am interested now in knowing what charge I should give to the jury—I can't see that the issue is in the case and Mr. Miller confirms that by saying that he doesn't think it is in there either.

MARVIN MILLER: Your Honor, we do feel—we would like a charge on the man's being on medication now and that they were looking at the man not in his normal state but in the state of mind that has been medicated.

THE COURT: Well, that is not what I am asking you. Then, this charge, proposed charge, the insanity charge we can eliminate.

As this Court has recently noted, counsel may refrain from requesting an instruction in order not to emphasize potentially damaging evidence or for other strategic reasons. *United States v. Barnes,* 586 F.2d 1052, 1059, (5th Cir. 1978). Similar motivations may cause counsel to withdraw a previously requested instruction. We will not second guess counsel's decision. Moreover, Rule 52(b) will not be used to allow counsel for the defendant to gamble first on acquittal and then, upon conviction, to raise on appeal any matters which could have been easily remedied at trial. *United States v. Jacquillon,* 469 F.2d 380 (5th Cir. 1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973). Accordingly, the trial court did not err by complying with defense counsel's request to omit an insanity charge.

## IV. CONSTITUTIONALITY OF 18 U.S.C. § 3

▇▇ Appellants Dorothy Hayes and Alice Baldwin urge that 18 U.S.C. § 3 is unconstitutional. The pertinent portion of that section provides:

> Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years.

Appellants argue that in cases where the maximum punishment of the principal is life imprisonment, inability to determine

one-half of the maximum punishment causes the statute to be unconstitutionally vague and indefinite. While the statute does not provide for a specific maximum sentence in situations of life imprisonment for the principal, failure to provide a clearer maximum possible sentence does not render the statute constitutionally infirm. *Earin v. Beto,* 453 F.2d 376 (5th Cir.), *cert. denied,* 406 U.S. 909, 92 S.Ct. 1618, 31 L.Ed.2d 819 (1972). Leaving the determination of maximum sentences to the court is not uncommon. *See Binkley v. Hunter,* 170 F.2d 848, 849 (10th Cir. 1948), *cert. denied,* 336 U.S. 926, 69 S.Ct. 645, 93 L.Ed. 1087 (1949). The statute can be reasonably construed to authorize a maximum sentence. *United States v. Rich,* 518 F.2d 980 (8th Cir. 1975), *cert. denied,* 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976).

Appellants further argue that their inability to determine the maximum possible punishment deprived them of effective assistance of counsel by rendering intelligent plea decisions impossible. Wading into uncertainty, however, is an integral part of lawyering. This area, like many others, is not cut and dried. But the fact that it is difficult to advise clients does not endow the argument with constitutional dimensions. We are unpersuaded that the area is so uncertain as to render counsel's advice ineffective.[7]

## V. BURIAL SITE PHOTOGRAPHS

▇▇ At trial, the government, over appellants' objection, introduced into evidence three photographs of the burial site. Appellants assert that the photographs here in question were the subject of a pre-trial agreement in which the government agreed not to introduce the pictures in return for the stipulation that the body found at the grave site was the same body on which the

---

7. Although the maximum penalty to which an accessory after the fact is subject in cases where the principal is sentenceable to life imprisonment is not directly at issue here, we can speculate that since the death penalty is a more severe punishment than life imprisonment, *see Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Krull v. United States,*

240 F.2d 122, 134 (5th Cir. 1957), and since the maximum sentence of an accessory after the fact to a capital offense is ten years, the maximum penalty to which an accessory after the fact would be subject where the maximum sentence of the principal is life imprisonment would be no more than ten years.

County Medical Examiner had performed an autopsy. Introduction of these "grotesque" photographs, appellants argue, constituted a breach of that agreement and a denial of due process. The government maintains that the pictures which were admitted into evidence were not the subject of the stipulation and that, accordingly, there was no error in their admission. We need not reach appellant's due process claim, however, since the record reflects that the questioned photographs were not the subject of the stipulation.

At the pretrial conference, the following colloquy ensued:

MARVIN MILLER (Defense Counsel): The prosecution is going to bring in pictures to show things that they want the jury to see.

THE COURT: Like what?

MARVIN MILLER: Pictures of maps, pictures of grave sites, things of that nature. We are not going to object to that. I think they are entitled to that; the pictures are evidence. I think the defendant himself is evidence of himself.

THE COURT: Well, I am asking these questions to find out. These pictures are of grave sites up in East Texas?

MARVIN MILLER: Yes, sir.

THE COURT: Okay, all right.

MARVIN MILLER: I think they are going to bring those in and they certainly should, but they have some very gory pictures that we are going to object to, which will serve to prejudice the minds of the jury.

THE COURT: You have characterized them as gory pictures. What are they pictures of?

MARVIN MILLER: Pictures of the corpse in a decomposed and bloated condition. We are not going to contest the fact that the body that was found in East Texas was the same body that Dr. Rubin Santos did an autopsy on.

THE COURT: You will stipulate to that?

MARVIN MILLER: We will stipulate to that.

MR. RINZEL: Under those circumstances, as we have informed Mr. Miller, we will not make any effort to introduce those pictures.

THE COURT: All right. The record will reflect that the stipulation has been made and the understanding that the Court has is that no effort will be made to introduce the pictures which you have characterized as being gory.

Later, when the government sought to introduce the pictures in question, the following colloquy ensued:

MARVIN MILLER: Your Honor, these photographs, we have already stipulated that that there was a body found out there. It was the same body and that Ruben Santos did an autopsy and they are trying to introduce these photographs simply to inflame the minds of the jury. We will stipulate the cause of death was a shotgun wound.

MR. RINZEL: These photographs were shown at a pre-trial conference and you indicated at that time no objection.

MARVIN MILLER: *I never saw these pictures before in my life except at the first trial. I never saw these pictures at any pre-trial or anything* (Emphasis added).

As the record does not support the contention that these pictures were the subject of the pre-trial stipulation, we need not reach appellant's due process claim.

## VI. SENTENCING

Appellants allege that the sentences imposed by the district court were unlawful because they were based on improper considerations, and because there was such a gross disparity between the severity of the crimes for which the defendants were convicted and the length of the sentences imposed so as to constitute cruel and unusual punishment.

It is well settled that a federal district judge has wide discretion in determining what sentence to impose and such a sentence will not be questioned on appeal so long as the sentence is within the statutory limits and there is no showing of arbitrary or capricious action amounting to a gross

abuse of discretion. *E.g., United States v. Rosen,* 582 F.2d 1032 (5th Cir. 1978); *United States v. Gray,* 565 F.2d 881 (5th Cir. 1978); *Herron v. United States,* 551 F.2d 62, 64 (5th Cir. 1977); *United States v. Trevino,* 490 F.2d 95 (5th Cir. 1973). The transcripts of the sentencing proceedings demonstrate that the district court considered sentencing alternatives, reviewed the pre-sentence reports, reviewed special medical reports and considered each of the appellant's background and circumstances before imposing sentence. The district court judge acted well within his discretion. We do not find these sentences so "completely arbitrary and shocking to the sense of justice" that they constitute cruel and unusual punishment. *Rodriquez v. United States,* 394 F.2d 825, 826 (5th Cir. 1968).

Appellant Frank Hayes further argues that the disparity between his sentence and the sentence imposed in another factually similar civil rights case mandates a reduction in sentence and evidences that the court was using improper considerations in determining his sentence. While the district court may consider sentences imposed in similar cases in arriving at its sentencing determination, the sentence is valid unless a showing of abuse of discretion by the district court is made. A defendant cannot rely upon the sentences which other defendants receive as any yardstick for his sentence.[8] *See United States v. Deaton,* 477 F.2d 65 (5th Cir. 1973).[9]

In accordance with the foregoing, these convictions are AFFIRMED.

---

8. We are aware of defendants' sentence reduction motion which was filed with the district court after the filing of notice of appeal. The district court judge correctly ruled that the court was without jurisdiction to consider that motion because of the pending appeal. *United States v. Garrett,* 583 F.2d 1381, 1391 (5th Cir. 1978). Our ruling here is in no way meant to prejudice the eventual disposition of that motion.

9. The question of sentencing is probably the most difficult area faced by trial judges. They must be given broad discretion in order to treat each defendant as an individual. Sentences are imposed upon individuals.