POLK v. STATE
2022 OK CR 24
Case Number: F-2021-343
Decided: 09/29/2022
JESSICA MARIE POLK, Appellant v. STATE OF OKLAHOMA, Appellee
Cite as: 2022 OK CR 24, __ __

 

OPINION
HUDSON, VICE PRESIDING JUDGE:
¶1 Appellant, Jessica Marie Polk, was tried and convicted by a jury in the District Court of Oklahoma County, Case No. CF-2019-1845, of Manslaughter in the First Degree, After Former Conviction of Two or More Felonies, in violation of (1). The jury sentenced Polk to twenty-five years imprisonment. The Honorable Ray C. Elliott, District Judge, presided at trial. Judge Elliott pronounced judgment and sentence in accordance with the jury's verdict, ordered credit for time served and ordered the sentence in this case to run concurrently with Appellant's sentences in CF-2016-6032, CF-2016-6316 and CM-2019-1493. Appellant must serve 85% of the sentence imposed before becoming eligible for parole. .
¶2 Polk now appeals and alleges a single proposition of error challenging the sufficiency of the evidence supporting her first degree manslaughter conviction. After careful review, we reject this claim and AFFIRM Appellant's judgment and sentence.
1. Facts 
¶3 The record shows that Appellant drove Justin Leslie (a/k/a "McChillin") to a neighborhood in southeast Oklahoma City on the pretense of buying drugs from Arnold Antwine Brown (a/k/a "Say No"). Leslie directed Appellant where to go and contacted Brown about purchasing methamphetamine. Cruz Castillo, who was a friend of Appellant's, went along for the ride. When the trio arrived in Brown's neighborhood, Leslie contacted Brown and told him they were almost to his house. Surveillance videos taken from neighboring homes show Appellant drove around the block and even stopped a few houses away to allow neighborhood children to pass unimpeded. At this point, Leslie telephoned Brown and told him to come out front.
¶4 The surveillance video shows what happened next. After the children walked out of the camera's view, the white Chevy Equinox SUV driven by Appellant pulled in front of a house on the opposite side of the street followed by the deafening sound of a shotgun blast. The white SUV slowed down prior to the shooting but the vehicle did not appear to stop. After the gunfire, Appellant sped off in the white SUV and drove Leslie to safety in Del City.
¶5 Police discovered Brown's body lying in the street in front of the house located at 716 S.E. 60th Street. Brown's chest was riddled with wounds made by a shotgun blast. Police found a hypodermic needle, a knife and a vial containing methamphetamine in Brown's pocket. Brown's cell phone was found nearby in the grass. Brown was transported by ambulance to OU Medical Center where emergency room doctors pronounced him dead. The medical examiner testified that Brown's injuries were consistent with having been made by shotgun pellets. The medical examiner estimated that Brown's cause of death was a gunshot wound to the chest fired from roughly four to twenty feet away. The manner of death was homicide.
¶6 Police examined Brown's cellphone and discovered the text messages between Leslie and Brown arranging for the purchase of drugs. The next day, police found the white Chevy SUV parked in the driveway of a house located in south Oklahoma City. Appellant was found inside the house along with others. Appellant directed police to the SUV's keys inside the house. She claimed to have borrowed the SUV from a friend named Johnny Perez in order to move. Appellant later made statements to the officers about being the driver of the white SUV. When told by a detective that the white SUV had been involved in a homicide, Appellant did not give any indication that she knew anything about it.
¶7 When police contacted Johnny Perez, he denied owning the SUV and denied having ever lent it to Appellant. On April 26, 2019, detectives Mirandized and interviewed Appellant again. During this interview, Appellant initially repeated her previous version of events. Eventually, however, Appellant admitted driving the white Chevy SUV to Brown's house but said that she did not kill Brown. Appellant had agreed to drive Leslie to Brown's house in order to obtain drugs from Brown. According to Appellant's version of events, the whole purpose of the trip to Brown's residence was to obtain drugs and she claimed to have no idea that Brown would be killed.
¶8 Appellant described how Leslie rode in the backseat and gave her directions to Brown's location. At Leslie's direction, Appellant circled the block then stopped in the neighborhood to let some children pass. Appellant said Leslie called Brown and told him to come outside. A short time later, Appellant saw Brown, whom she knew, walking outside towards the curb. Appellant told the detectives that after they pulled up, Leslie opened fire from the backseat of the SUV and shot Brown from approximately ten feet away. Leslie then shouted for Appellant to "go, go, go" and drive away. Appellant described being completely stunned by the shooting and she denied knowing that Leslie had brought the shotgun. Indeed, she claimed not to have even seen the gun Leslie used. Appellant opined that Leslie must have hidden the gun in his pants.
¶9 Appellant identified Leslie's mugshot for detectives during the interview. Appellant said she had only known Leslie for a short time, having met him in 2019 through her ex-boyfriend. Appellant also denied knowing that Leslie or Brown were members of the Irish Mob gang. Authorities discovered, however, that Brown's killing was a gang murder ordered by Irish Mob members incarcerated in Oklahoma state prisons. Christopher Ryan, a former member of the Irish Mob with an extensive criminal history, testified that he was aware of Leslie's involvement in Brown's murder. Ryan knew Leslie and Brown from the gang and he was friends with Brown. Ryan spoke with Leslie both before and after the murder about what happened.
¶10 According to Ryan, the victim became a member of the Irish Mob six months before the murder. Through multiple conference calls with leaders of the gang, Ryan described how the higher ups in the Irish Mob considered putting a "green light," or a hit, on Brown. Ryan initially believed the group would only beat-up Brown and kick him out of the gang. On a later conference call, Leslie agreed to "take care of" the situation. A couple of days before the murder, Leslie borrowed Brown's 12-gauge sawed-off shotgun. Leslie created a ruse and told Brown he needed to use the sawed-off shotgun for Irish Mob work. In reality, Leslie wanted to make sure Brown did not have access to a weapon when he carried out the hit. In the end, Leslie murdered Brown with Brown's own shotgun. According to Ryan, the murder weapon had a roughly fifteen-inch barrel attached to the stock and was not very big.
¶11 Ryan later encountered Appellant while both were housed in pods located on adjacent floors of the Oklahoma County Jail. Ryan testified that Appellant contacted him through the toilet in his cell and the pair had a conversation about Brown's murder. Appellant told Ryan to tell Leslie that he needed to take responsibility for what he did to Brown. Appellant explained that she was not happy about being held on murder charges in connection with Brown's killing. Appellant explained to Ryan that she was very upset about the situation and did not want to take murder charges because she did not do anything other than get rid of the gun.
¶12 The State played for the jury several intercepted phone calls made by Appellant to her family during her pretrial detention in the county jail. During one call, Appellant said she did not murder anyone and was in "the wrong place at the wrong time." Appellant also claimed that she and Castillo did not know beforehand that Leslie was going to kill Brown. During another call, Appellant said Leslie told her they would get "three zips," or ounces, of meth from Brown for $500.00. Appellant brought $300.00 and Leslie brought $200.00 for the transaction. Appellant wanted two of the bags for her $300.00 since she was giving Leslie a ride. Ultimately, Appellant hoped to "remake" some of her money with the transaction. Appellant also denied knowing that Leslie had a gun during the car ride. Appellant believed Leslie and others wanted her to take the fall for Brown's murder. Appellant admitted too that she sped off from the scene and had not called the police.
2. The Charges
¶13 For her part in this crime, the State ultimately charged Appellant with first degree misdemeanor manslaughter. The State alleged that Appellant acted jointly with Justin Leslie and, while in the commission of the misdemeanor crime of endeavoring to possess a controlled dangerous substance (methamphetamine), killed Arnold Brown, when Leslie shot and killed Brown with the sawed-off shotgun. See ; . The State alleged in the alternative that Appellant committed the crime of accessory to a felony, specifically, murder in the first degree, by driving Leslie away from the scene of the murder. See .
3. The Verdicts
¶14 After twenty minutes of deliberation, Appellant's jury convicted her of first degree misdemeanor manslaughter, rejecting the alternative charge of accessory to a felony. During separate penalty phase deliberations, the jury found the existence of two or more prior felony convictions and sentenced Appellant to twenty-five years imprisonment.
4. Sufficiency of the Evidence
¶15 In resolving a challenge to the sufficiency of the evidence, we apply Supreme Court precedent which holds that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In Appellant's case, we answer that question in the affirmative.
¶16 Taken in the light most favorable to the State, sufficient evidence was presented at trial to allow any rational trier of fact to find beyond a reasonable doubt that Appellant committed the crime of first degree misdemeanor manslaughter as charged in this case. Id. at 319; Davis v. State, , ¶ 74, , 111. Based on the total record evidence, the jury could reasonably conclude that Appellant perpetrated Arnold Antwine Brown's homicide while acting jointly with Justin Leslie, and while in the commission of the misdemeanor crime of endeavoring to possess a controlled dangerous substance (methamphetamine), when Leslie shot and killed Brown with the sawed-off shotgun.
¶17 "Homicide is manslaughter in the first degree . . . [w]hen perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor." (1). Endeavoring to commit the misdemeanor crime of possession of controlled dangerous substances as charged here is 1) knowingly and intentionally; 2) endeavoring; 3) to possess; 4) the controlled dangerous substance of methamphetamine. See ; . Appellant's jury was appropriately instructed, in accordance with OUJI-CR (2d) 6-16, that "endeavoring" meant "any effort to do or accomplish the evil purpose that the law was enacted to prevent." See Tidmore v. State, , ¶ 6, , 178. "The endeavoring statute is completely separate from the general statute defining attempt, and there is no requirement of an overt act to complete the crime." Id., , ¶ 4, 95 P.3d at 178.
¶18 The misdemeanor-manslaughter statute "does not distinguish among the type or category of misdemeanor which can be used as the underlying offense in a misdemeanor manslaughter charge[.]" State v. Ceasar, , ¶ 10, , 794. Our cases, however, require a nexus between the death of the victim and the underlying misdemeanor for the misdemeanor-manslaughter statute to apply. "The focus should be on whether the underlying misdemeanor offense was causally related to the decedent's death." Id., , ¶ 11, 237 P.3d at 794. The test of causal relation applied in this, and other homicide contexts, is referred to as "proximate cause" and "focuses on whether the defendant's conduct was a substantial factor in bringing about the victim's death." Id., , ¶ 11, 237 P.3d at 794-95. See Lime v. State, , ¶ 9, , 712. "That other factors may have contributed to the death does not necessarily absolve the defendant of criminal liability for homicide in the commission of a misdemeanor." Ceasar, , ¶ 11, 237 P.3d at 795.
¶19 The record shows Appellant drove Justin Leslie to and from the scene of the murder on the pretense of purchasing $500.00 worth of methamphetamine from Brown. Although she claimed not to know of Leslie's murderous plan, the evidence shows the pair were engaged in an inherently or potentially dangerous activity in which violence is common. Det. Bryn Carter, one of the lead detectives in the case, described for the jury how the street-level buying and selling of illegal drugs is inherently dangerous to human life. Det. Carter explained that these transactions involve people carrying large sums of cash who usually don't trust each other and who therefore carry guns for protection. True to form, two of the main actors in this case both had weapons. Leslie used an easily transportable, concealed sawed-off shotgun to murder the victim from the backseat of the white SUV driven by Appellant. The record shows that Brown was killed with his own gun after loaning it to Leslie a few days earlier and that police recovered a knife from Brown's pocket.
¶20 The gang aspect of this case further adds to the potential danger. Christopher Ryan testified that the Irish Mob, which does not include women in its membership, engages in low-end, street-level drug dealing to make money. According to Ryan, people sometimes hang around members of the Irish Mob because it is an easier way to get methamphetamine. Ryan's testimony revealed that part of the business of the Irish Mob was "enforcement work" meaning violent acts directed at collecting money.
¶21 Appellant admitted that, at Leslie's direction, she circled the block in the white Chevy SUV, then stopped so passing children could leave the area, before approaching the spot where Leslie shot Brown. Video from neighboring surveillance cameras confirmed Appellant's account of circling the neighborhood and waiting for the children to leave the area. These actions were just as consistent with the commission of endeavoring to possess methamphetamine as they were carrying out the drive-by shooting of the victim. Notably, the surveillance video shows the white SUV driven by Appellant does not actually stop, but only slows down, immediately prior to the gunshot going off. Based on this evidence, along with Appellant's statement to Ryan that she disposed of the gun after the homicide and the fact that she drove Leslie to safety after the killing, the jury could reasonably conclude that Appellant's conduct in the commission of the crime of endeavoring to possess methamphetamine was a substantial factor in bringing about the victim's death.
¶22 It is not enough, as Appellant claims, that she did not know of Leslie's intention to murder Brown as part of an Irish Mob hit. Even if this were true, the evidence showed that Appellant's decision to endeavor in the possession of methamphetamine was inherently or potentially dangerous to human life in light of the facts and circumstances surrounding both the misdemeanor and the homicide; that the possibility of violence occurring during a street-level drug transaction of this type was reasonably foreseeable; and that her act of driving Leslie to Brown's location on the pretext of purchasing narcotics led directly to Brown's murder. That Leslie may have found another way to murder Brown had Appellant not driven him to Brown's location that day misses the point. The fact remains that Appellant was the person who drove Leslie to the crime scene in order to endeavor to possess methamphetamine and her actions during the commission of this misdemeanor offense led directly to Brown's death. "'[W]here events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken and the perpetrator is held criminally responsible for the resulting harm.'" A.L.G. v. State, , ¶ 5, , 522 (quoting United States v. Haynes, 589 F.2d 811, 821 (5th Cir. 1979)). Such is the case here. Sufficient evidence thus was presented to support Appellant's conviction for first degree manslaughter. Relief is denied for Appellant's sole proposition of error.
DECISION

¶23 The Judgment and Sentence of the District Court is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2022), the MANDATE is ORDERED issued upon the delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE RAY C. ELLIOTT, DISTRICT JUDGE

APPEARANCES AT TRIAL
KIMBERLY MILLER
BAILEY DAUGHTERY
ASST. PUBLIC DEFENDERS
320 ROBERT S. KERR
SUITE 600
OKLAHOMA CITY, OK 73102
COUNSEL FOR DEFENDANT

APPEARANCES ON APPEAL
HALLIE ELIZABETH BOVOS
ASST. PUBLIC DEFENDER
320 ROBERT S. KERR AVE.
SUITE 400
OKLAHOMA CITY, OK 73102
COUNSEL FOR APPELLANT

RYAN STEPHENSON
COLLEEN GALAVIZ
ASST. DISTRICT ATTORNEYS
320 ROBERT S. KERR AVE.
SUITE 500
OKLAHOMA CITY, OK 73102
COUNSEL FOR THE STATE

JOHN M. O'CONNOR
OKLA. ATTORNEY GENERAL
JOSHUA H. COLE
ASST. ATTORNEY GENERAL
313 N.E. 21ST
OKLAHOMA CITY, OK 73105
COUNSEL FOR APPELLEE

OPINION BY: HUDSON, V.P.J.
ROWLAND, P.J.: CONCUR LUMPKIN, J.: SPECIALLY CONCUR LEWIS, J.: SPECIALLY CONCUR
MUSSEMAN, J.: CONCUR 
FOOTNOTES
 Ryan testified that, by flushing and removing the water from the toilet, he could talk to other inmates housed on floors above and below his cell.
 Appellant was originally charged with first degree murder in the case.
 Contrary to the specially concurring opinions, today's holding is not inconsistent with Simms v. State, , . The prosecutor in Simms charged the wrong crime for the facts, viz., first degree felony murder using the underlying crime of distribution of a controlled dangerous substance. Id., , ¶¶ 5-9, 499 P.3d at 1238-39. There, as here, Appellant was a buyer, not a seller, of drugs and could not be properly charged with distribution because she did not actively commit that crime. Id., , ¶¶ 8-9, 499 P.3d at 1240. Despite the inherent dangers associated with both distribution and endeavoring to possess controlled dangerous substances, these crimes represent "opposite poles of a typical sales transaction[.]" Id., , ¶ 7, 499 P.3d at 1239. The appropriate charge here, as in Simms, was first degree misdemeanor manslaughter using the underlying crime of endeavoring to possess controlled dangerous substances.

LUMPKIN, JUDGE: SPECIALLY CONCURRING:
¶1 I concur in the results reached in this case. However, I write to point out the inconsistencies between this opinion and the majority opinion in Simms v. State, , .
¶2 In Simms, the majority placed no emphasis upon the inherent dangerousness of illegal drug transactions, even though two people died. Its focus was on a single facet of the case, i.e., that the defendant was the buyer of the drugs, not the seller. Based on the status of the defendant as a buyer, the opinion discussed no other aspects of the case, such as the defendant's actions in bringing another man and likely, a gun to the drug sale. The majority opinion reversed the defendant's felony murder conviction, finding a buyer could not be a distributor in the crime of distribution of illegal drugs, despite the fact that our felony murder statute has no requirement that the person charged must be a distributor in the crime.
¶3 Conversely, in this case, the opinion discusses the inherent dangerousness of illegal drug transactions at length. In fact, the opinion finds that "the possibility of violence occurring during a street-level drug transaction of this type was reasonably foreseeable; and [Appellant's] act of driving [the actual killer to the seller's] location on the pretext of purchasing narcotics led directly to [the seller's] murder." The opinion finds Appellant committed the crime of endeavoring to possess meth and that the victim died during her commission of this misdemeanor. In other words, the statute requires the defendant to be a principal in the commission of the misdemeanor.
¶4 As I read the statutes applicable to each case, convictions are proper in both. Both cases demonstrate the inherent dangerousness of illegal drug sales to all parties, not just the seller. In my dissent in Simms, I stated, "the Legislature has clearly intended for the Felony Murder Doctrine to apply to third persons when their participation in felonious conduct results in the death of another." Simms, , ¶ 9, , 1242, Lumpkin, J., dissenting. In both cases, the defendants' "participation in felonious conduct" resulted in the deaths of others. There is no justification for the different results in the cases. Therefore, I question the continued viability of Simms.

FOOTNOTES
 There are two statutes at issue: in Simms, felony murder and in this case, first degree (misdemeanor) manslaughter. The felony murder statute applicable in Simms states that the defendant may be convicted of felony murder when he "or any other person takes the life of a human being during, or if the death of a human being results from, the commission or attempted commission of . . . distributing controlled dangerous substances." (B). In this case, "[h]omicide is manslaughter in the first degree . . . [w]hen perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor." (1).

LEWIS, J., SPECIALLY CONCURRING
¶1 The Court's opinion today seems to acknowledge that one who endeavors to possess a controlled drug is engaged in inherently or potentially dangerous conduct in which acts of violence are reasonably foreseeable; and that liability for criminal homicide may attach if human life is taken in the commission of the crime.
¶2 Today's holding is somewhat difficult to reconcile with Simms v. State, , . The Court in Simms reversed the felony murder conviction of a defendant who contacted a dealer and arranged to buy drugs. At the meeting, either the defendant or an unknown accomplice murdered the drug dealer and his companion, and stole the marijuana.
¶3 The defendant in Simms was certainly endeavoring to possess drugs, and caused two deaths in the process. After this Court reversed his felony murder conviction, he pled guilty to a reduced charge of first degree manslaughter based on this same underlying misdemeanor, and received concurrent twenty year prison terms and ten years probation. So Simms managed to avoid two murder convictions for intentional killings that happened during, and as a direct result of, his willing participation in a crime of drug distribution. See (B).
¶4 I would reiterate the argument from my dissent in Simms that the Court interpreted the felony murder statute too narrowly by holding that liability attached only to a principal in the underlying drug felony. The Court thus precluded murder convictions for a pretended purchaser--by nature a willing participant in the drug deal--who caused the deaths of the distributor and his companion.
¶5 Both cases show that illegal purchasers of controlled drugs are engaging in inherently or potentially dangerous conduct. Where their own wrongful actions in that course of conduct endanger others, with fatal results, the policy of the felony murder and misdemeanor manslaughter statutes, and in my view, their plain language, authorize a conviction. Further clarification of the felony murder and misdemeanor manslaughter statutes will require the Legislature's intervention.