**UNITED STATES of America**

v.

**Walter Leroy MOODY, Jr.**

**Crim. A. No. 90–41–MAC.**

United States District Court,
M.D. Georgia,
Macon Division.

April 24, 1991.

Louis J. Freeh, Sp. Prosecutor, Samuel A. Wilson, Asst. U.S. Atty., U.S. Attorney's Office, Macon, Ga., for plaintiff.

Edward D. Tolley, Athens, Ga., for defendant.

## ORDER

ALAIMO, District Judge, sitting by designation.

On December 14, 1990, a jury found Walter Leroy Moody guilty of one count of conspiracy and multiple counts of subornation of perjury, obstruction of a criminal investigation, obstruction of justice, tampering with a witness and bribery. This case is presently before the Court on Moody's motion for a new trial. Moody alleges five grounds of error. First, he contends there was insufficient evidence to support his conviction. Second, he argues that the Court erred in admitting certain documents which he claims were illegally seized. Third, he claims that the Court improperly allowed Tommy C. Mann, an attorney who represented Moody in 1972, to testify. Fourth, he asserts that the Court erred in admitting evidence of extrinsic acts pursuant to Rule 404(b) of the Federal Rules of Evidence. Finally, Moody contends the Court erred in granting his request to withhold a jury instruction on insanity. As discussed below, the Court finds that each ground is without merit. Accordingly, Moody's motion for a new trial must be denied.

### BACKGROUND FACTS

The first link in the chain of events surrounding Moody's conviction was forged nearly 20 years ago. In 1972, Moody was convicted of possessing a pipe bomb which exploded and seriously injured his ex-wife, Hazel Moody, on May 7, 1972. Moody's principal defense at his 1972 trial was that a man he called "Gene Wallace" had secretly planted the bomb in Moody's Macon home. The Gene Wallace defense was unsuccessful, and upon conviction Moody served three years in prison for possession of the pipe bomb. Moody's improper efforts to reverse his 1972 conviction form the backbone of the present perjury, obstruction, bribery, tampering and conspiracy crimes.

In late 1985, Moody met Julie Linn West, a 34–year–old single parent who has been confined to a wheelchair since the age of 14. At the time, West was plagued with financial problems. Moody offered to pay West $100.00 a month if she would give perjured testimony about the 1972 pipe bomb explosion. West agreed. Over the course of the next few years, Moody concocted and coached West to memorize the following story:

*In May of 1972, West and her mother, Joanne Ekstrom, traveled to Atlanta from their Wisconsin home. While staying at a motel, West, who was a teenager at the time and already paralyzed from the waist down, met a man named Gene Wallace. Wallace asked West for a date and, after pleading with her mother, West was allowed to go. Wallace drove to Macon. He proceeded to a house, retrieved a package from his car, and placed the package inside the house. While driving away, he exclaimed, "I forgot, he doesn't have a phone," and doubled back to the house. As they pulled in front of the house, emergency vehicles were already lining the street, and it looked as though some sort of explosion or fire had occurred inside the house.*

*When West questioned Wallace about the package, he beat her. He took her back to her motel, and she never saw him again. However, the memories of that day haunted her. She had frightful dreams for years. Finally (after 14 years), she could stand it no longer. West, who lived in Atlanta in 1986, decided to go to the Macon library to discover whether anyone had been injured in the explosion. Aided by helpful librarians, West and her mother learned of the fate of Hazel Moody, and eventually got in touch with Walter Moody, who at last had someone to corroborate his "Gene Wallace defense."*

Moody went to great lengths to ensure West would appear credible when relating her story. Aside from helping her memorize the details, he instructed West to go to the Macon Library and conspicuously ask for assistance in using the microfilm equipment. He also instructed West to pretend to have lost a pen bearing her initials. West was to ask the librarians about the pen, and make sure the librarians were

apprised of West's initials. Apparently, West's mother was not available to go to Macon, so Susan Moody, Walter's wife, donned a wig to impersonate West's mother and drove West to the library.

Armed with West's affidavit describing the details of her fictional date with Gene Wallace, Moody filed a petition for a writ of error *coram nobis* in the United States District Court for the Middle District of Georgia. In his petition, Moody asked the Court to vacate, nullify and reverse his 1972 conviction based on West's affidavit. In January 1988, Moody offered to pay Ekstrom if she would confirm her daughter's story. Ekstrom agreed, and Moody began coaching her as well.

On February 1, 1988, the United States District Court for the Middle District of Georgia held a hearing on Moody's petition. West testified as she had been instructed. Ekstrom, too, testified, but she had trouble remembering her lines. To support their claims about the library trip, Moody called the helpful Macon librarian to the stand, who might not have remembered every patron but certainly remembered the paraplegic who left her personalized pen behind. Although Moody still paid Ekstrom (on the Courthouse steps) for her testimony, he was angered by her poor performance and told her that she "lost the case for him." Moody was apparently right, for his petition was denied on February 8, 1988. Moody had exhausted the appeals process by early 1990.

In February of 1990, Moody became aware that federal investigators and a federal grand jury were investigating his connection with West and Ekstrom. Moody repeatedly instructed West and Ekstrom never to admit that they had lied. He delivered detailed instructions on how to conceal their perjurious acts and then burned the instructions. When the women appeared to waiver in their support for Moody, he threatened that the "Miami Mafia" might murder them if they allowed the true facts to come to light.

Unbeknownst to Moody, West eventually agreed to cooperate with federal authorities. A hidden video camera in West's apartment captured the sights and sounds of Moody coaching her on the finer points of obstructing the criminal investigation.

At trial, West testified that the whole Gene Wallace story was fabricated by Moody, who coached her and paid her for her performance. Ekstrom testified to the same effect. To eradicate any doubt of guilt created by the fact that its star witnesses were admitted perjurers, the Government introduced the incriminating video and audio tapes. Furthermore, the Government showed that the Gene Wallace story could not have been true because medical records established that West spent the month of May 1972 in a Wisconsin hospital.

## I. SUFFICIENCY OF THE EVIDENCE

Moody first contends that there was insufficient evidence to support his convictions. The decision to grant or deny a new trial motion based on the weight of the evidence rests in the sound discretion of the trial judge. However, "[m]otions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really exceptional cases." *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir.1985). The Court should not reconsider the evidence and set aside a jury verdict simply because it feels some other result would be more appropriate. *Id.* at 1312–13. Rather, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1313; *accord United States v. Fernandez*, 905 F.2d 350, 352 (11th Cir.1990).

In the present case, the evidence strongly supports the jury verdict. As the above recitation of the evidentiary facts shows, there was an overwhelming array of documentary, testimonial and video evidence to support a guilty verdict on all thirteen counts. The Court will not, therefore, disturb the jury verdict.

## II. SEARCH AND SEIZURE

Prior to trial, defendant moved to suppress certain evidence seized pursuant to

**594**

court-authorized search warrants issued on February 8, July 10 and August 17, 1990. The Court adopted the recommendation of Magistrate Claude W. Hicks of the Middle District of Georgia to deny defendant's motion to suppress. *See* Order of December 10, 1990. Defendant continues to argue that the searches and seizures were illegal and now claims that this alleged illegality mandates a new trial. As discussed below, all search warrants were valid and executed properly. Accordingly, defendant's motion for a new trial on this ground must be denied.

### A. *Factual Setting*

In February of 1990, Moody became the subject of an extensive investigation into the mail bomb murders of Judge Robert S. Vance of the Eleventh Circuit Court of Appeals and Savannah, Georgia, attorney Robert E. Robinson. Moody was also a suspect in connection with the attempted bombings of the Eleventh Circuit Court of Appeals building in Atlanta, Georgia, and the National Association for the Advancement of Colored People ("NAACP") building in Jacksonville, Florida.

While searching for items which would link Moody to those bombing incidents, federal agents saw, in plain view, evidence which supported Moody's illegal involvement in the *coram nobis* proceeding. The agents obtained additional warrants to seize the evidence relating to the *coram nobis* petition. Moody alleges that the searches and seizures were illegal because (1) there was insufficient probable cause to support the issuance of the warrants; (2) the warrants lacked particularity; and (3) the warrants were executed in an overly broad manner.[1]

### B. *February 8 Warrants*

United States Magistrate John E. Dougherty of the Northern District of Georgia issued two warrants on February 8, 1990. These warrants authorized the search of defendant's home and his truck.

#### (1) Probable Cause

The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence of the offense exists at the place to be searched. *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir.1984). Absent arbitrariness, a magistrate's determination that probable cause exists is conclusive. *Id.* In the present case, the magistrate had enough information to conclude that the February 8 warrants should be issued.

The warrants were issued based on the affidavit of Special Agent Frank P. Lee of the Bureau of Alcohol, Tobacco and Firearms. Lee has 23 years of experience in the field of bomb investigation. While defendant asserts that Lee's affidavit is "bare bones and conclus[o]ry," it is actually a 43–page tome which exhaustively explains the staggering number of similarities in the recent bombings and the 1972 bombing. Aided by a computer, Lee had searched the descriptions of 10,000 previous bombing incidents. Only one matched the description of the 1989 bombs—the one Moody was convicted of possessing in 1972.

#### (2) Particularity

Elaborate specificity in a warrant is not necessary. A description is sufficiently particular when it enables a searcher to reasonably ascertain and identify the items authorized to be seized. *United States v. Peagler*, 847 F.2d 756, 757 (11th Cir.1988); *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir.1982). In the present case, the warrant listed many household items such as string, stamps, address labels and envelopes. Defendant complains that this permits officers to instigate a "fishing expedition" through all of his personal items. Defendant forgets that all of those items are components of a mail bomb and are described as particularly as possible. That is all the law requires. *See*

---

1. Defendant also made an argument that the Government was only pretending to investigate him in connection with the 1989 bombings as a

pretext for something else. As the Magistrate found, such a contention is absolutely lacking in support.

*United States v. Davis,* 589 F.2d 904, 906 (5th Cir.1979) (in bombing investigation, search warrant listing items such as "white string" and "brown paper" is sufficiently particular).

### (3) Execution of the Warrant

■ A search can be as extensive as reasonably required to locate the items sought in the warrant. *United States v. Wuagneux,* 683 F.2d at 1349. The reasonableness of the search depends on the complexity of the crime being investigated. *United States v. Heldt,* 668 F.2d 1238, 1257 (D.C.Cir.1981). Defendant fails to specify how the execution of this search was allegedly unreasonable. Nevertheless, a look at the inventory return shows that the search was not overly broad. All of the evidence seized was either particularly described in the warrant or had a substantial nexus to the bombing investigation.

### C. *July 10 Warrant*

On July 10, 1990, United States District Judge Richard C. Freeman of the Northern District of Georgia issued a warrant authorizing another search of Moody's residence. The warrant was supported by Special Agent Lee's affidavit, which was amended to include several facts which had come to light subsequent to the February request for a warrant. During the February search, agents saw, in plain view, documents indicating that Moody was involved in a plan to obstruct justice. Furthermore, Julie Linn West had since come forward explaining her involvement in the *coram nobis* proceeding. The warrant authorized the seizure of videotapes, audiotapes, journals, notebooks, writings and computer discs dealing with the mail bombing and obstruction of justice activities.

### (1) Probable Cause

■ The affidavit submitted in support of the warrant overwhelmingly demonstrates probable cause. The Government had been conducting a court-authorized electronic surveillance of Moody's home. Agents overheard Moody state that he had taped newscasts about the bombings *before* he knew he was a suspect. The Government also reasoned that messages from Moody's answering machine might reveal who his conspirators were. Furthermore, the Government intercepted various conversations revealing that Moody kept a journal concerning the *coram nobis* proceeding. The Government knew from talking to West that Moody wrote "scripts" for her to follow regarding the *coram nobis* proceeding. Thus, there was probable cause to support the request to seize the tapes and documents.

### (2) Particularity

■ The warrant identified the items as particularly as possible, considering the nature of the items and the scope of the crimes under investigation. Moreover, courts often look to an attached affidavit for assistance in finding the requisite specificity. This is particularly true when the affidavit is made available at the search site as happened in the present case. *See United States v. Weinstein,* 762 F.2d 1522, 1531 (11th Cir.1985); *In re Search Warrant,* 667 F.2d 117, 134 (D.C.Cir.1981); *United States v. Wuagneux,* 683 F.2d at 1349; *United States v. Heldt,* 668 F.2d at 1257.

### (3) Execution

The inventory return from the search clearly indicates that the search was not executed in an overly broad fashion. Thirty-one items are listed on the return, and all but one is a videotape, audiotape, journal, writing, notebook or computer disc as described in the warrant. The only article which does not fit within the warrant is a computer system seized by the agents. However, Moody's trial was not tainted in any way by the seizure, for the Government never mentioned the computer at trial.

### D. *August 17 Warrant*

■ On August 17, 1990, Judge Freeman issued a warrant authorizing another search of Moody's residence. Moody concedes that the warrant was valid, but argues that it was executed improperly. The

warrant authorized the seizure of a letter-folding machine and representative samples of any letters, papers or other documents which appear to have been mechanically folded. An affidavit presented in support of the warrant stated that certain threatening letters accompanying the mail bombs appeared to have been folded similarly to letters used in Moody's business, the Associated Writer's Guild of America, Inc.

A majority of the items seized during the August search were not representative samples of folded letters. They were documents which incriminated Moody in the present case. However, these documents came within the plain view of agents (who had highly specialized knowledge of Moody's alleged criminal activities) as they examined papers to see if they were business-related documents bearing creases.

To be admissible under the plain-view doctrine, the items must be seized by an officer (1) who has an independent justification for being in a position from which the items can be viewed; (2) who discovers the items inadvertently; and (3) to whom it is immediately apparent that the items are evidence. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971); *United States v. Jenkins*, 901 F.2d 1075, 1081–82 (11th Cir. 1990); *United States v. Blum*, 753 F.2d 999, 1002 (11th Cir.1985). The plain-view doctrine applies to the August search. Federal agents went to Moody's house for the specific purpose of searching for and seizing the letter-folding machine and representative samples of creased business letters. They could not accomplish their search without examining documents which might constitute samples. The value and significance of the seized documents were readily apparent to the agents who had specialized knowledge of Moody and the allegations against him.

To summarize, the February, July and August warrants were valid. Each was supported by probable cause and adequately described the items to be seized. Furthermore, each was executed properly. All evidence seized was either described in the warrants or was subject to the plain-view doctrine. Accordingly, Moody's motion for new trial based on improper searches and seizures must be denied.

## III. ATTORNEY–CLIENT PRIVILEGE

Defendant alleges that the Court erred by allowing Tommy C. Mann, an attorney who represented Moody during his 1972 trial for possession of a bomb, to testify in the present case. Moody alleges that Mann's testimony violated the attorney-client privilege. The Court finds that the scope of Mann's testimony fell squarely within Moody's waiver of the privilege.

### A. *Factual Setting*

Tommy C. Mann was appointed to represent Moody in his 1972 trial for possession of a bomb. Fourteen years later, in his 1986 petition for a writ of error *coram nobis*, Moody made a two-fold argument. Along with his claim of newly discovered evidence (the Julie Linn West performance), he asserted a claim of ineffective assistance of counsel based on Mann's failure to adequately pursue the Gene Wallace defense. Moody submitted a 71–paragraph affidavit in support of his petition. Approximately 40 of those paragraphs selectively reveal alleged conversations that transpired between Moody and Mann concerning Gene Wallace. *See* Moody Affidavit of March 10, 1988, Middle District of Georgia, No. 86–241–1–MAC, pp. 30–70. For example, Moody asserted that "prior to entering a plea, [Moody] spoke to Mr. Mann and told him Gene Wallace was responsible for putting the destructive device in affiant's home on May 7, 1972." *Id.* at p. 30. Furthermore, Moody attached to his affidavit 10 documents which were allegedly copies of letters he sent to Mann urging him to investigate Gene Wallace prior to the 1972 trial.

At the trial of the case at bar, the Government called Mann to the stand. His direct testimony was perhaps the most brief and general of the entire trial. *See* Trial Tr. pp. 352–56. Mann was asked to recall the first time he heard the name Gene Wallace. Mann responded that he

first heard that name sometime during the 1972 trial. *Id.* at p. 352. The Government then proceeded to read one of the letters Moody attached to his *coram nobis* petition. The letter, which begged Mann to pursue the Gene Wallace defense, was supposedly written by Moody to Mann shortly before the 1972 trial. *Id.* at pp. 352–53. Mann testified that he did not recall receiving the letter and that the letter was not in his Moody case file. Mann was then asked whether he made it a business practice to save letters from clients and whether he had available to him investigators to help him pursue leads. Mann answered both questions affirmatively. *Id.* pp. 354–56.

### B. *Waiving Attorney–Client Privilege*

■ The content of Mann's short testimony was no longer shielded by the attorney-client privilege. The attorney-client privilege promotes freedom of discussion between a client and his lawyer by eliminating the fear that the lawyer will subsequently be compelled to disclose confidential communications. Once the *client* has disclosed privileged communications, however, there is no justification for retaining the privilege. *United States v. Suarez,* 820 F.2d 1158, 1160 (11th Cir.1987). "[I]t has long been held that once waived, the attorney client privilege cannot be reasserted." *Id.* This doctrine of implied waiver is most often invoked when a client attempts to use the privilege as a sword (by selectively disclosing attorney communications in attacking his attorney) and then as a shield (by hiding behind the privilege in an attempt to prevent his attorney from responding). It has been established law for more than one hundred years that a client who waives the privilege by leveling charges against his attorney cannot insist that his attorney remain silent. *See Hunt v. Blackburn,* 128 U.S. 464, 470–71, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888).

■ The privilege is inconsistent with the goal of discovering the truth at trial. Accordingly, courts narrowly construe its protection and broadly apply its waiver. *In re Grand Jury Proceedings,* 896 F.2d 1267, 1270, (11th Cir.1990) *vacated as moot,* 904 F.2d 1498 (11th Cir.1990). Several courts have held that voluntary disclosure of *part* of a privileged communication waives the privilege as to all communications *concerning the same subject matter.* *See, e.g., United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982); *In re Sealed Case,* 676 F.2d 793, 808–09 (D.C.Cir.1982); *Champion Int'l Corp. v. International Paper Co.,* 486 F.Supp. 1328, 1331–32 (N.D. Ga.1980); *International Tel. & Tel. Corp. v. United Tel. Co.,* 60 F.R.D. 177, 185–86 (M.D.Fla.1973). A few courts hold that a waiver extends only to communications *actually revealed* and will not extend to waive communications touching on similar subject matters. *See In re Von Bulow,* 828 F.2d 94, 102–03 (2nd Cir.1987) (when client makes extrajudicial disclosures, privilege waived only as to conversations actually revealed).

■ In the present case, Moody clearly waived any privilege regarding the content of the 40 paragraphs and 10 letters he voluntarily disclosed by including them in his *coram nobis* petition. This Court does not have to reach the issue of whether Moody waived all communications relating to the subject matter of the disclosures, because Mann never testified about related subject matter. The Government asked and Mann answered very circumscribed and very direct questions about information which Moody had previously revealed. Moody asserted that he told Mann about Gene Wallace before trial. Mann disagreed. Moody claimed to have written a letter to Mann urging him to explore the Gene Wallace defense. Mann stated that he did not possess such a letter. Crucially absent from Mann's testimony is any embellishment. Mann simply denied very specific facts which Moody had previously disclosed. Such testimony will not chill open communication between a lawyer and his client. Therefore, Moody's motion for a new trial based on the attorney-client privilege must be denied.

### IV. EXTRINSIC ACTS

■ Defendant argues that he is entitled to a new trial because the Government

introduced evidence of extrinsic acts. As discussed below, the Court finds that such evidence was not unduly prejudicial and was properly admitted pursuant to Rule 404(b) of the Federal Rules of Evidence in order to prove that Moody had the intent necessary to commit the crimes.

Rule 404(b) of the Federal Rules of Evidence states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■■■■ In deciding whether to admit extrinsic act evidence, trial courts are afforded broad discretion. *United States v. Jones*, 913 F.2d 1552, 1566 (11th Cir.1990). In this Circuit, the rule is one of "inclusion" regarding Rule 404(b) evidence, for the balance is struck in favor of admissibility. *See United States v. Terzado–Madruga*, 897 F.2d 1099, 1119 (11th Cir.1990); *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir.1989) (rule relating to evidence of prior acts is one of inclusion which allows evidence of prior acts unless it tends to prove only criminal propensity).

■■■■ The test for admissibility of extrinsic act evidence is whether the evidence is relevant to an issue other than the defendant's character and whether its probative value is outweighed by its prejudicial effect. *United States v. Foster*, 889 F.2d 1049, 1054 (11th Cir.1989) (citing *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978)). Where extrinsic evidence is offered to prove intent, the charged crime and the extrinsic evidence must be similar

enough in their characteristics to permit an inference that the defendant had the same state of mind when committing both acts. *United States v. Beechum*, 582 F.2d at 911.

■■■■ It is well-settled law in this Circuit that simply by pleading not guilty—particularly when a conspiracy is charged—the defendant sufficiently raises the issue of intent and justifies the admissibility of extrinsic act evidence unless the defendant takes affirmative steps to remove intent as an issue in the case. *United States v. Cardenas*, 895 F.2d 1338, 1342 (11th Cir. 1990).

In the present case, Moody did not remove intent as an issue. Instead, his entire defense was based on his claim that he lacked the necessary intent to commit the charged crimes. His opening statement and closing argument were designed to attack West and Ekstrom, who Moody claimed were really in control of his actions and were using him as an unwitting pawn.[2] Moody argued that he did not intentionally utilize bribery, intimidation and subornation of perjury to obstruct justice. He argued that he was a vulnerable man being manipulated by wily women. Every defense witness was called to try to prove that Moody could not or did not form the requisite intent for the crimes charged. In short, intent was not just an issue in this case, it was Moody's entire defense.

In order to prove that Moody had the required intent, the Government introduced evidence of several extrinsic acts. James Williams, a professional polygrapher, testified that Moody offered to pay Williams one thousand dollars if he would falsify the results of Moody's polygraph. Moody planned to introduce the sham polygraph results in a Florida legal proceeding.[3]

---

**2.** In his opening statement, Edward Tolley, Moody's attorney, said that "at all times it was these gals who were really in control.... In the final analysis, they were the ones who actually committed the crimes." Trial Tr., vol. I, p. 43. In his closing argument, Tolley suggested that perhaps these women were blackmailing Moody. After all, Tolley opined, "these women are street smart. They'd cut your throat and leave you in the street." *Id.* at vol. V, p. 77.

**3.** The "Florida legal proceeding" was actually a criminal case in which Moody was charged with attempted murder. Three of Moody's former employees, Timothy Williams, Warren Glover and Dan Fiederer, claimed that Moody tried to drown them off the coast of the Florida Keys in 1982. Moody claimed that inclement weather made him lose hand control of the boat and drive in the opposite direction of the drowning men for several hours. Glover recalled that, when Moody finally did return, he was holding

Douglas Padgett testified that he represented Moody in the Florida legal proceeding. Moody had pledged title to his sailboat in order to secure payment for Padgett's legal fees. When Padgett tried to collect, Moody induced Ted Banks, an associate, to sign a letter falsely stating that Banks had title to the boat. Trial Tr., vol. III, pp. 288–89, 295–298.

Timothy Williams, who Moody hired to design a motor boat, testified that Moody would not pay him his salary unless he agreed to alter his testimony in the Florida legal proceeding. When Williams refused, Moody sent Julie Ivey, an associate, to Williams' apartment. Moody coached Ivey on how to gain incriminating evidence against Williams. Moody instructed Ivey to record Williams speaking about drug use. On the eve of the Florida legal proceeding, someone called Williams and played the incriminating tape. *Id.* at pp. 371–375.

Dr. Ronald Tolbert, a veterinarian, testified that he performed an autopsy on Moody's dog. Moody believed his dog had been poisoned by a neighbor, and took the neighbor to court to resolve the dispute. However, Dr. Tolbert found absolutely no evidence that the dog had been poisoned. Dissatisfied with Tolbert's conclusion, Moody drafted an affidavit stating that laboratory results indicated the dog was poisoned. Moody then asked Tolbert to sign the false affidavit. *Id.* pp. 326–27.

The extrinsic evidence was not offered to prove criminal propensity. It was offered for the proper purpose of proving intent by showing a pattern of conduct. The extrinsic acts involved schemes to bribe, intimidate and suborn witnesses to commit perjury and to obstruct justice; so do the crimes for which Moody was convicted in this case. In each instance, Moody coaxed, bribed or intimidated others to lie. Moody then attempted to use those lies to advance his own position in a legal proceeding. Significantly, the extrinsic act evidence direct-

ly refutes Moody's "pawn in the hands of wayward women" defense. The extrinsic act evidence shows that Moody was capable of controlling and directing others to lie for him. It was Moody alone who tried to bribe a professional polygrapher. It was Moody alone who encouraged a veterinarian to commit perjury.

The extrinsic evidence was not too prejudicial. The acts discussed were not of a "heinous nature" likely to incite a jury to an "irrational decision." *See United States v. Schardar*, 850 F.2d 1457, 1463 (11th Cir.1988); *United States v. Beechum*, 582 F.2d at 917. In fact, Moody's extrinsic acts are akin to the type of extrinsic fraud which courts have routinely admitted on the issue of intent. *See, e.g., United States v. Mitchell*, 666 F.2d 1385, 1390 (11th Cir.1982) (similarity of charged and extrinsic transactions, both evincing intent to defraud the Government, admissible where extrinsic offense not of heinous nature likely to incite jury to irrational decision); *United States v. Schardar*, 850 F.2d at 1462–63 (extrinsic evidence of creating false shipping documents and creating false bills of lading is relevant to prove intent in falsification of documents charge).

To eliminate the possibility of any undue prejudice, the Government was prohibited from making any reference to the fact that the Florida legal proceeding was a *criminal* case against Moody. Furthermore, the Court ruled that the Government must similarly omit any reference to the 1989 bombing deaths. *See* Order of December 10, 1990. It should also be noted that the Government had still more evidence that Moody had threatened witnesses in the past. However, the Court prohibited introduction of this testimony on the grounds that it would be unnecessarily repetitive. Trial Tr., vol. III, p. 381. Finally, the possibility of undue prejudice was mitigated by the Court's limiting instructions to the jury, cautioning them that the evidence

an anchor which he smashed into Williams' head. The case was dismissed for reasons unknown to this Court. *None* of this information ever reached the present jury. The Court determined that it would be too prejudicial even to

mention the fact that it was a criminal case that had proceeded against Moody. Accordingly, all witnesses were cautioned to refer to the case only as a "Florida legal proceeding."

was admitted only to prove intent. Trial Tr., vol. III, p. 302 & vol. V, p. 135. *See United States v. Hernandez,* 896 F.2d 513, 523 (11th Cir.1990); *United States v. Hewes,* 729 F.2d 1302, 1315 (11th Cir.1984) (cautionary instructions limit the prejudicial effect of extrinsic evidence).

In summary, the evidence of extrinsic acts was neither overly prejudicial nor was it admitted to prove criminal propensity. It was carefully tailored to refute Moody's claims that he lacked intent and that he was being manipulated by West and Ekstrom. Accordingly, Moody's motion for a new trial based on the introduction of extrinsic evidence is denied.

## V. INSANITY INSTRUCTIONS

Moody asked the Court not to submit insanity instructions to the jury. After considering Moody's motivations for such a request, observing Moody's demeanor throughout the trial and reviewing the evidence concerning Moody's mental state, the Court complied with his request. Moody now asserts that the Court erred in respecting his wishes. He argues that the Court should have given jury instructions on insanity and submitted an insanity verdict form to the jury [4] despite his specific and well-reasoned request to abandon an insanity defense. The following discussion of the facts and laws governing the insanity defense shows that the Court correctly withheld a jury charge on insanity.

### A. *Factual Setting*

On December 5, 1990, Moody notified the Court, pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure, of his intention to use a psychiatric defense. Pursuant to 18 U.S.C. § 4241, the Court had already ordered Moody to undergo a psychological evaluation to determine his competency to stand trial. *See* Order of September 17, 1990. The following is a summary of the results of Moody's competency evaluation and the trial testimony regarding Moody's mental condition at the time of the crimes.

#### (1) Competency to Stand Trial

Scott Duncan, a clinical psychologist at the United States Penitentiary in Atlanta, administered the competency examination on September 28 and October 3, 1990. Duncan described Moody as "very cooperative and responsive" and as a person with "normal judgment" and "very superior" intellectual functioning. Moody's intelligence test results indicate that he has an I.Q. of 130; only 2% of the population tests higher.

Based on his examination of Moody, Duncan concluded that Moody was competent to stand trial. Specifically, Duncan found that Moody had a sufficient ability to consult with his attorney and to assist properly in his defense. Furthermore, Duncan concluded that Moody had a rational understanding of the nature and consequences of the proceedings against him. Duncan's conclusions comport with the legal standards for competency to stand trial. *See Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960); *Card v. Dugger,* 911 F.2d 1494, 1518 (11th Cir.1990).

Moody's behavior during trial confirmed his competence. At all times throughout the proceedings he was cooperative with court personnel. Moreover, he appeared alert and appropriately interested in the progress of his trial. He assisted his lawyer in the individual *voir dire* and selection of the jury. As witnesses were testifying, he would occasionally confer with his attorney. He was concerned with his own appearance and even requested a mid-trial haircut. In summary, the Court had every reason to believe that Moody was a competent and active participant in the defense of his case.

A competency evaluation focuses on a defendant's ability to understand the proceedings brought against him and meaningfully assist in his own defense *at the time of trial.* In contrast, the insanity defense focuses not on a victim's present mental

---

**4.** Whenever the issue of insanity is submitted, the jury shall be instructed to find the defendant

(1) guilty; (2) not guilty; or (3) not guilty only by reason of insanity. 18 U.S.C. § 4242(b).

state but, rather, on his mental condition *at the time of the offense.*

### (2) Mental Condition at Time of Offense

Once the Government rested its case, Moody sought to introduce evidence regarding his mental condition at the time of the crimes. He offered a videotape depicting the interior of his house. Perhaps he opted for a visual presentation of his home because words are inadequate to describe how disorganized it was. There was a place for nothing, and nothing was in its place. Next, Moody called his younger sister to the stand. She testified that she, her grandfather and her younger brother had suffered from mental problems in the past. Finally, Moody called two expert witnesses. Howard Albrecht, a clinical psychologist, testified on direct examination that the first time he saw Moody was November 18, 1990. Albrecht said that Moody shows signs of "disturbed thinking consistent with a psychotic process." Trial Tr., vol. IV, p. 46. Albrecht concluded that Moody is a schizophrenic person who "cannot distinguish reality from fantasy." In Albrecht's estimation, Moody's illness was possibly caused by an unconfirmed prison rape. Trial Tr., vol. IV, pp. 50–51.

On cross-examination, however, Albrecht admitted that he actually had first seen Moody in 1985. The Government then read Albrecht's 1985 diagnosis into the record. According to the 1985 report, Moody suffered from a "mixed personality disorder with obsessive-compulsive, narcissistic and borderline features and infantile trends." Trial Tr., vol. IV, p. 54. The report also concluded that Moody might tend to seek gratification from homosexual activities, particularly involving oral sex. Trial Tr., vol. IV, p. 56. Albrecht concluded his cross-examination testimony by explaining that Moody's condition had deteriorated significantly over the five years from 1985–1990. Trial Tr., vol. IV, p. 61.

The final witness for the defense was Dr. Sheldon Bradley, a psychiatrist. Dr. Bradley specifically refuted Albrecht's diagnosis. Dr. Bradley testified that Moody was not schizophrenic but that Moody suffers from a paranoid personality disorder. As Dr. Bradley explained, the most severe mental disorders are psychoses; psychotics are often schizophrenics haunted by delusional thoughts. Less severe than psychoses are neuroses, and least severe of all are personality disorders. Dr. Bradley would not state that Moody was psychotic, delusional or schizophrenic. He could only confirm that Moody suffered from a personality disorder. Trial Tr., vol. IV, pp. 126–27.

In rebuttal, the Government called two expert witnesses, Drs. Scott Duncan and Park Dietz, both of whom basically echoed the conclusions of Dr. Bradley. Dr. Duncan, a psychologist, testified that Moody was not psychotic or delusional, but did have a personality disorder. Trial Tr., vol. IV, p. 153. Dr. Dietz, a forensic psychiatrist, testified that Moody suffers from a paranoid personality disorder and an antisocial personality disorder. Trial Tr., vol. IV, p. 171. Although Dr. Dietz went to great lengths to discover whether Moody was delusional, he was unable to find that Moody suffers from delusional thoughts. Trial Tr., vol. IV, p. 174.

### (3) Request to Withdraw Proposed Jury Charge

Prior to trial, Moody had submitted to the Court proposed jury instructions. Two are relevant to the present motion. First, Moody wanted the Court to instruct the jury on the insanity defense and give the jury the option to find him not guilty only by reason of insanity. Moody also asked the Court to instruct the jury on *mens rea* and the Government's burden of proving that Moody had the required state of mind to commit the charged crimes.

However, after hearing all of the expert testimony regarding Moody's sanity at the time of the offenses, Moody, through his attorney, Edward Tolley, asked the Court not to charge the jury on insanity. Tolley explained that, after hearing all the evidence, Moody felt it would be in his best interest not to submit the insanity issue to the jury. Rather, Moody wanted the jury to consider whether any illness affected his ability to form the intent to commit the

crimes in question. In effect, Moody wanted to put all his eggs in the *mens rea* basket. Tolley had previously informed the Court that Moody was uncomfortable with the insanity issue because a successful insanity defense has disadvantages which are absent in other defenses. Unlike a successful defense based on lack of *mens rea*, a successful insanity defense could result in confinement for an even longer period than would a finding of guilt. Nevertheless, Tolley told the Court that he had advised Moody to proceed with the insanity defense. In assessing Moody's decision to abandon the defense, Tolley stated "I must confess there's a measure of logic in this." Trial Tr., vol. IV, p. 196.

The Court then addressed Moody personally to ensure that Moody understood the implications of abandoning the defense and to confirm his reasons for the abandonment. Trial Tr., vol. IV, pp. 196–97.

**B. *Imposing Insanity Defense on an Unwilling Defendant***

 Trial judges faced with the decision of whether to impose an insanity defense on an unwilling defendant are poised at an analytical fork-in-the-road. One path represents the approach taken in *Frendak v. United States*, 408 A.2d 364 (D.C.1979). The *Frendak* approach emphasizes the quality of the defendant's choice and narrows a judge's ability to impose an insanity defense on an unwilling defendant. The second path, now becoming the one less followed,[5] is represented by *Whalem v.* *United States*, 346 F.2d 812 (D.C.Cir.1965), and its progeny. The *Whalem* line of cases places an emphasis on the strength of the evidence which would support an insanity defense. Both paths place the decision in the sound discretion of the trial judge whose familiarity with the defendant and the evidence is preeminent.[6] *Foster v. Marshall*, 687 F.Supp. 1174, 1175 (S.D.Ohio 1987); *Patton v. United States*, 403 F.2d 923, 925 (D.C.Cir.1968); *Cross v. United States*, 389 F.2d 957, 960 (D.C.Cir.1968); *Trest v. United States*, 350 F.2d 794, 795 (D.C.Cir.1965). Under either view, it was well within the Court's discretion to withhold a jury instruction on insanity in the present case.

**(1) The *Frendak* Approach**

The approach taken in *Frendak v. United States*, 408 A.2d 364 (D.C.1979), narrows the discretion of a trial judge to impose an unwanted insanity defense. Rather than allowing a trial judge to raise the defense whenever there is sufficient evidence, *Frendak* requires the judge to respect the defendant's wishes so long as he is capable of voluntarily and intelligently waiving an insanity defense. *Frendak*, 408 A.2d at 379. So long as a defendant is competent to waive the defense, is informed of the alternatives to an insanity defense, understands the consequences of waiving the defense and freely chooses to waive the defense, a trial judge must respect the defendant's decision.[7] *Id.* at 380.

---

**5.** Commentators suggest that the trend is toward the *Frendak* view. *See* A. Singer, *The Imposition of the Insanity Defense on an Unwilling Defendant*, 41 Ohio St.L.J. 637, 650 (1980) (while preferring the *Frendak* view over the *Whalem* view, the author suggests that even the narrow *Frendak* view is too paternalistic); R. Bonnie, *The Dignity of the Condemned*, 74 Va.L.R. 1363, 1390 (1988); D. Cohn, *Offensive Use of the Insanity Defense: Imposing the Insanity Defense Over the Defendant's Objection*, 15 Hastings Const.L.Q. 295, (1988).

**6.** Appellate courts consistently uphold the discretion of trial judges, both when they decided to impose the defense and when they did not. *Compare United States v. Wright*, 511 F.2d 1311, 1312 (D.C.Cir.1975) ("*Wright I*"), *with United States v. Wright*, 627 F.2d 1300, 1308 (D.C.Cir.

1980) ("*Wright II*"). The two cases are unrelated except for the fact that they involve the same defendant, Beachy L. Wright, and his destruction of government property on two separate occasions. In *Wright I*, the court upheld the trial judge's imposition of the insanity defense; in *Wright II*, the court upheld the trial judge's decision not to impose the insanity defense.

Courts will occasionally remand a case to the trial judge to supplement an incomplete record. *See, e.g., United States v. Robertson*, 507 F.2d 1148 (D.C.Cir.1976); *United States v. Snyder*, 529 F.2d 871 (D.C.Cir.1976).

**7.** A mere finding that the defendant is competent to stand trial does not necessarily mean that he is competent to waive the insanity defense. *Frendak*, 408 A.2d at 380. In order to be

In placing greater emphasis on the defendant's choice, the *Frendak* court fell in line with United States Supreme Court decisions which show a trend toward judicial deference to a defendant's trial strategy. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (criminal defendant may voluntarily, knowingly and understandingly plead guilty for strategical reasons, despite his continuing assertions of innocence); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (criminal defendant has a constitutional right to represent himself if he knowingly and voluntarily waives his right to counsel).

The Court recognized that a defendant may wish to avoid an insanity verdict for several rational reasons. First, a finding of insanity may result in a longer period of confinement. Second, the defendant may find the conditions in a mental hospital more objectionable than those in jail. Third, a defendant may wish to avoid the stigma of insanity. Fourth, the defendant may see an insanity defense as an admission of guilt. Fifth, several adverse collateral consequences may follow a finding of insanity, such as voting, driving and working restrictions. *Frendak,* 408 A.2d at 377–78; *see also,* German & Singer, *Punishing the Not Guilty: Hospitalization of Persons Acquitted by Reason of Insanity,* 29 Rutgers L.Rev. 1011 (1976). It is the defendant who must bear the ramifications of a successful insanity defense, so his intelligent and voluntary decision to forego the defense should be respected.

In the present case, Moody clearly made an intelligent, voluntary and knowing decision to abandon the insanity defense. As the record indicates, Moody's attorney had explained the insanity defense to him and had advised him of the implications of abandoning the defense. Trial Tr., vol. IV, p. 196; Transcript of Hearing on New Trial Motion ("NT Tr.") pp. 4, 6. Counsel indicated that there was nothing to indicate

that Moody did not fully appreciate and understand his advice. NT Tr., p. 11. Furthermore, the Court addressed Moody personally in order to ensure that his decision was voluntarily made, and Moody confirmed his attorney's statements. Trial Tr., vol. IV, p. 198. Accordingly, under the *Frendak* view, the Court correctly complied with the defendant's wish not to charge the jury on insanity.

### (2) The *Whalem* Approach

Another seminal case addressing the rights of a defendant who refuses to rely on a possibly viable insanity defense is *Whalem v. United States,* 346 F.2d 812 (D.C.Cir.1965). The *Whalem* court held that society has an interest in preventing the conviction of an "obviously mentally irresponsible defendant." *Id.* at 818. Accordingly, a trial judge has the discretion to impose the insanity defense when there is a sufficient question as to the defendant's mental responsibility. *Id.* Later cases refined the specific factors which will guide a trial judge in exercising his discretion. Whenever a competent defendant voices objections to an insanity defense, a judge must look to: (1) the quality of the defendant's decision not to raise the defense, including the reasonableness of his motives in opposing the defense; (2) the court's personal observations of the defendant; and (3) the quality of the evidence supporting the defense. *United States v. Robertson,* 430 F.Supp. 444, 447 (D.D.C.1977); *Wright,* 627 F.2d at 1308.

In the present case, the three factors militate toward not giving insanity instructions. First, the defendant, a competent, alert and supremely intelligent individual, voiced reasonable motives for opposing the insanity charge. Moody had two primary reasons for not wanting the jury to decide the insanity issue. First, as a matter of trial tactics, he wanted to rely exclusively on the *mens rea* defense. The Eleventh

---

competent to stand trial, a defendant must have the ability to cooperate with his attorney, assist with his own defense and understand the nature of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788–89, 4

L.Ed.2d 824 (1960). The *Frendak* approach requires a defendant to have more particularized knowledge, such as an awareness of the alternatives and consequences of a successful insanity defense.

Circuit has recognized that insanity defense strategies and tactics "are a matter for decision by defendant and his counsel, without interference by the Court." *Edwards v. United States*, 795 F.2d 958, 963 (11th Cir.1986) (holding that a trial court has no duty to raise an insanity defense when there is no evidence to support it); *accord United States v. Edwards*, 488 F.2d 1154, 1164 (5th Cir.1974) (recognizing defense counsel's authority to shun the insanity defense on the basis of trial strategy); *Mendenhall v. Hopper*, 453 F.Supp. 977, 983 (S.D.Ga.1978), *aff'd*, 591 F.2d 1342 (5th Cir.1979) (trial judge has no affirmative duty to inquire about the sanity of the defendant). In *United States v. Hayes*, 589 F.2d 811 (5th Cir.1979), the defendant decided to abandon his insanity defense mid-trial. Defendant's counsel requested the trial court to withdraw a previously requested insanity instruction. In holding that the trial court did not err by complying with defense counsel's request to omit an insanity charge, the former Fifth Circuit noted that strategic reasons may cause counsel to withdraw a previously requested insanity instruction. *Id.* at 825.

As his attorney admitted, Moody's strategy to stress the *mens rea* defense was indeed logical. NT Tr., p. 5. The Government bears the burden of proving beyond a reasonable doubt that Moody had the requisite mental state to commit the crimes. Conversely, if Moody had cast his lot with the insanity defense, he would have had to prove by clear and convincing evidence that

he suffered from a severe mental disease or defect. Secondly, a successful defense based on *mens rea* would result in an acquittal, while a successful insanity defense could result in an indefinite confinement. *See United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir.1990).[8] Legal scholars have recognized that a defendant in such a situation may attempt to pressure the jury into acquitting him by not offering the jury the "compromise" verdict of insanity. *See* Comment, *The Right and Responsibility of a Court to Impose the Insanity Defense Over the Defendant's Objection*, 65 Minn.L.Rev. 927, 945, n. 97.

The Court's personal observations of the defendant militate strongly toward respecting his desire not to have the jury consider insanity. Moody's courtroom behavior was exemplary. He was cooperative, alert and appropriately interested in the progress of the trial. As he jotted notes to his attorney or quietly whispered comments to him, it became clear that Moody was taking a very active role in charting the course of his defense. Moody had actually co-signed certain pretrial documents, and his attorney referred to him as "assisting legal counsel." Trial Tr., p. 196. Nothing in his courtroom behavior would suggest that Moody was anything but perfectly competent to make the choice that he did.

Finally, the quality of the evidence supporting an insanity defense was not strong.[9] In the Insanity Defense Reform

---

**8.** In passing the Insanity Defense Reform Act of 1984, Congress prohibited the defenses of diminished responsibility and diminished capacity. However, Congress did not intend to prohibit the use of psychiatric evidence to negate specific intent when such is an element of the offense charged. *Cameron*, 907 F.2d at 1060; *United States v. Pohlot*, 827 F.2d 889, 890 (3rd Cir.1987). The psychiatric evidence must support a legally acceptable theory of lack of *mens rea. Id.* For example, in *United States v. Staggs*, 553 F.2d 1073 (7th Cir.1977), the defendant was on trial for threatening a policeman. As evidence negating *mens rea,* the defendant was allowed to introduce psychiatric evidence showing that he was unlikely to make threats. *Id.* at 1076.

Like the defendant in *Staggs*, Moody has presented psychiatric evidence which, if believed, would support a legally acceptable theo-

ry of lack of *mens rea.* For instance, Moody was charged with intimidating a witness. To be convicted, Moody must be found to have knowingly, and with the intent to influence testimony, intimidated a witness. 18 U.S.C. § 1512. Moody argued that he never intimidated West and Ekstrom. He claimed that West and Ekstrom were actually *controlling him.* Therefore, Dr. Albrecht's conclusion that Moody's psychiatric problems make him "vulnerable to victimization" tends to negate the specific intent called for in the statute. *See* Trial Tr., vol. IV, p. 47.

**9.** In most of the reported cases discussing the imposition of the insanity defense on an unwilling defendant, the defendant refuses to proffer evidence of insanity at trial. The trial judge becomes aware of the possibility of the defense only through counsel or by viewing a competency report. Accordingly, unlike this Court, a

Act of 1984, Congress defined the insanity defense as follows:

(a) **Affirmative defense.**—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

Insanity Defense Reform Act of 1984, Pub.L. No. 98–473, Title II, § 402(a), 98 Stat. 2057, § 20, *recodified* at 18 U.S.C. § 17.

According to the legislative history of the Insanity Defense Reform Act, the word "severe" was added to the Act "to emphasize that nonpsychotic behavior disorders or neuroses such as an 'inadequate personality,' 'immature personality' or a pattern of 'antisocial tendencies' do not constitute the defense." 1984 U.S.Code Cong. & Admin.News 3182, 3411.

At trial, three doctors, including one defense witness, testified that Moody was not psychotic, delusional or schizophrenic. Those three experts testified that Moody suffers from a personality disorder. Therefore, the testimony of those three doctors would provide no basis to support the giving of an insanity instruction, even if the defendant had requested one.

However, one psychologist, Dr. Albrecht, did testify that Moody showed signs of disturbed thinking consistent with a psychotic process. The only other evidence which could possibly be construed as supporting an insanity instruction is the videotape of Moody's disorganized house and the lay testimony of his sister asserting that mental health problems plague the Moody family. This expert and lay testimony is not so strong so as to require the imposition of an insanity instruction on a competent defendant who has rational reasons for shunning it.

In *United States v. Owens,* 854 F.2d 432 (11th Cir.1988), the Eleventh Circuit discussed the quantum of insanity evidence necessary to reach the jury when the defendant requests an insanity instruction. The *Owens* court reasoned:

Traditionally, in this Circuit, a defendant who requested an instruction on insanity was entitled to it "if there [was] some evidence supporting the claim of insanity.... This means only slight evidence." *Blake v. United States,* 407 F.2d 908, 911 (5th Cir.1969) (en banc). This quantum of evidence rule, however, predates 18 U.S.C. section 17. When Congress enacted section 17 as part of the Insanity Defense Reform Act of 1984, Congress changed the law: Congress redefined insanity and gave defendants the burden of proving insanity by "clear and convincing evidence."

*Id.* at 434 (citation omitted).

Such a change in the burden of proof necessarily alters the standard for determining when there is sufficient evidence to support an insanity instruction. Accordingly, the *Blake* "some" or "slight" evidence standard no longer controls. *Id.* at 435. The new standard dictates that a defendant is due a jury instruction on insanity only when the evidence would allow a jury to find that insanity has been shown with convincing clarity. "If evidence would permit the jury to find to a high probability that defendant was insane, an insanity instruction is required." *Id.* at 436; *see also United States v. Whitehead,* 896 F.2d 432, 434 (9th Cir.1990) (citing *Owens* for the proposition that defendants are now required to proffer a higher quantum of evidence to reach the jury on the insanity issue).

In the present case, Dr. Albrecht, the sole expert whose testimony could be construed as supporting the theory that Moody had a severe mental disease or defect, was uncertain whether Moody's al-

---

trial judge usually will not have the benefit of hearing the testimony and cross-examination of the relevant witnesses. For that reason, the trial judge is required to hold a hearing in order to assess the strength of the evidence of insani-

ty. *See United States v. Robertson,* 507 F.2d 1148, 1161 (D.C.Cir.1974) (trial judge must ensure thorough examination of insanity evidence).

leged schizophrenia was present at the time of the crimes. Nevertheless, mindful of the jury's right to determine credibility, to weigh the evidence and to draw justifiable inferences of fact, the Court probably would have submitted the insanity issue to the jury *if the defendant had requested the charge*. For example, in *Owens*, the defense expert had testified that defendant was a psychotic who was unaware of his surroundings. Conversely, the Government's expert stated that defendant was not psychotic although he did show signs of "disturbance." The defendant requested a jury instruction on insanity. The court of appeals reversed the trial judge's decision not to give the requested charge. Viewing the evidence in the light most favorable to the defendant, the evidence was sufficient to warrant a jury instruction. *Owens*, 854 F.2d at 435.

The evidence of insanity is far from strong in the present case and would barely be sufficient to reach the jury pursuant to the defendant's request. But when submitting the issue flies in the face of the defendant's well-reasoned request, a trial judge would abuse his discretion by giving instructions which rest on such a slender reed of evidence.

As the *Wright* court explained, when the insanity defense is not strong, the defendant's choice may deserve ultimate deference. *Wright*, 627 F.2d at 1311 n. 80; *see also Cross v. United States*, 389 F.2d 957, 960 (D.C.Cir.1968) (reasoning that the defendant's wishes regarding the insanity defense are highly relevant, and his "active opposition renders especially delicate a decision by court or counsel to override them"); *accord Patton v. United States*, 403 F.2d 923 (D.C.Cir.1968); *Trest v. United States*, 350 F.2d 794 (D.C.Cir.1965).

The present case is analytically similar to *United States v. Wright*, 627 F.2d 1300 (D.C.Cir.1980). The defendant in *Wright* was accused of destroying federal property, and he claimed that he was "inspired" to do so by the Holy Spirit. Although the defendant had a history of mental illness, he refused to raise the insanity defense. The court held a hearing in order to explore any evidence of insanity. One doctor testified that Wright was a paranoid schizophrenic who could not distinguish reality from fantasy, but two other psychiatrists concluded that he was not psychotic although he did suffer from a personality disorder. *Id.* at 1303–04. The trial judge refused to impose an insanity defense, and the court of appeals affirmed the decision. Even though there was some evidence to support raising the insanity defense, there were sound reasons for the trial judge to comply with the defendant's request. First, the two doctors who concluded that Wright was not psychotic were credible and believable, although their testimony conflicted with the third expert. Second, the defendant appeared rational throughout the proceedings. Finally, the defendant gave sensible, logical reasons for preferring not to raise the insanity defense. Specifically, Wright feared indefinite confinement in a mental institution, and he also believed that asserting an insanity defense would compromise his religious beliefs. *Id.* at 1308.

In the present case, as in *Wright*, an intelligent, competent and informed defendant made a rational decision to abandon a weak defense—a weak defense which, even if successful, would undermine his goal of acquittal and result in indefinite confinement. The *Whalem/Wright* approach allows a judge to impose strategies and defenses upon an unwilling defendant in order to prevent the conviction of an "obviously mentally irresponsible defendant." Moody was obviously competent. Moody was obviously cognizant of the implications of foregoing an insanity defense. Moody was obviously rational in helping to steer the course of his defense. Based on the expert and lay testimony elicited at trial, Moody was *not* obviously mentally irresponsible at the time of the offense. There was no error, therefore, in complying with Moody's wish to withdraw his proposed jury instruction on insanity.

### C. *Faretta Concerns*

 Defense counsel seeks to distinguish cases such as *United States v. Hayes*, 589 F.2d 811 (5th Cir.1979), which

uphold the trial judge's decision to withhold an insanity instruction, by stressing that, unlike the situation in *Hayes*, Moody proceeded against the advice of counsel. According to defense counsel, "this raises the issue of whether, by proceeding against the advice of counsel, defendant waived his constitutional right to counsel, and if so, if defendant was competent to waive that right."

Defense counsel correctly cites *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), for the proposition that a trial judge must ensure that a defendant's decision to proceed *pro se* is a knowing and intelligent decision. Counsel incorrectly relies on *Stano v. Dugger*, 889 F.2d 962 (11th Cir.1989), to support his contention that, by refusing to follow counsel's advice, Moody was electing to proceed *pro se*. The 1989 *Stano* decision did require a trial judge to conduct a *Faretta* inquiry when a defendant pleads guilty against the advice of his counsel. However, the 1989 *Stano* opinion was vacated. *See* 897 F.2d 1067 (11th Cir.1990).

On rehearing, the Eleventh Circuit held that proceeding against the advice of counsel is *not* tantamount to waiving counsel. *Stano v. Dugger*, 921 F.2d 1125, 1146–47 (1991). In order to invoke the right to self-representation and trigger the need for a *Faretta* hearing, a defendant must unambiguously communicate to the court his desire to proceed *pro se*. The request must be so clear that "no reasonable person can say that the request was not made." *Id.* at 1143 (quoting *Dorman v. Wainwright*, 798 F.2d 1358, 1366 (11th Cir.1986)).

In the present case, it was clear that Moody was *not* waiving his right to counsel and electing to proceed *pro se*. Both Moody and his attorney agree that Moody sought, considered and understood counsel's advise regarding the insanity defense. In Moody's final and informed analysis, he elected not to follow his attorney's advice on the insanity instruction issue. As the *Stano* court noted on rehearing, even a defendant represented by an attorney retains final authority to make fundamental decisions. The defendant is still "master

of his case." *Stano v. Dugger*, 921 F.2d at 1146–47.

In summary, Moody did not unambiguously communicate to the Court his desire to proceed *pro se* by disagreeing with his attorney on whether to submit an insanity instruction to the jury. Accordingly, the Court did not err by failing to conduct a *Faretta* inquiry.

CONCLUSION

Fairly tried criminal cases cannot be retried whenever a convicted defendant concludes, with the benefit of hindsight, that he should have employed a different strategy. Walter Leroy Moody, Jr., received a fair trial, one notably free from any prejudicial errors which would require a second trial. Accordingly, the defendant's motion for a new trial is hereby DENIED.

SO ORDERED.